[No. F005130. Fifth Dist. Mar. 14, 1986.]

MARVIN BRAUDE et al., Plaintiffs and Appellants, v.
AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA,
Defendant and Appellant.

998

COUNSEL

Alvin S. Kaufer and Carlyle W. Hall, Jr., for Plaintiffs and Appellants.

Hufstedler, Miller, Carlson & Beardsley, Seth M. Hufstedler, John Sobieski and John P. Olson for Defendant and Appellant.

OPINION

BROWN (G. A.), P. J.—Plaintiffs, Marvin Braude and James Ruddick, appeal from a judgment of the superior court disallowing an award of attorneys' fees to them on either the substantial benefit theory or the private attorney general theory codified in Code of Civil Procedure[1] section 1021.5. The defendant, Automobile Club of Southern California (the Club) cross-appeals from the judgment insofar as it prohibits the Club from using general proxies in contested elections of the board of directors of the Club. We will reverse the decision insofar as it denies attorneys' fees under the private attorney general doctrine and will otherwise affirm the judgment.

This case was initially filed in February 1971—15 years ago. Since then there have been three trials in Los Angeles County and two former appeals, reported in *Braude v. Havenner* (1974) 38 Cal.App.3d 526 [113 Cal.Rptr. 386] (*Braude* I) and *Braude v. Automobile Club of Southern Cal.* (1978) 78 Cal.App.3d 178 [144 Cal.Rptr. 169] (*Braude* II).

Plaintiffs commenced these proceedings pursuant to Corporations Code section 2236 et seq. to set aside an election of members of the board of directors of the Club. They mounted a broad attack upon the fairness of the Club's procedures for election of directors, with emphasis being placed upon the fairness and validity of the use of proxies. Plaintiffs were eventually successful in obtaining a judgment condemning the bylaws as they relate to the nomination and election of the Club's board of directors and in the adoption of comprehensive revisions setting forth reasonable procedures that will permit all members, if interested, the opportunity to be nominated and stand for election to the board.

---

[1]All references to code sections will be to the Code of Civil Procedure unless otherwise indicated.

While the issues for our determination are rather narrow, to properly resolve them it is necessary to discuss in some detail the background and facts of this litigation.

### *The Club and Its Operations*

The Club is a nonprofit mutual benefit corporation. (Corp. Code, § 7110 et seq.) Membership is voluntary. Members have no financial interest in the Club, no dividends are paid and membership cannot be transferred.

In 1969 the Club had approximately 980,000 master (voting) members. In 1980 the Club had grown to 1,772,000 master members and 955,000 associate (nonvoting) members. Each year since 1969 more than 90 percent of the Club's members renewed their membership. At oral argument counsel stated the membership is now over 2,000,000.

As of the time of the trial herein the Club had 83 district offices and approximately 5,900 employees. In 1979 the total assets of the Club and its subsidiaries (excluding the Interinsurance Exchange) were $110,600,000, while total income was $136,100,000, and expenses were $124,500,000.

As of December 31, 1979, the Interinsurance Exchange of the Club had total assets of $716,900,000, total liabilities of $537,200,000, and a surplus of $179,700,000. Its 1979 earned premiums totaled $415,900,000, while underwriting deductions were $408,400,000 and net investment income was $31,700,000. Its net income was $40,400,000.

The Club provides a wide range of auto-related services to its members. For example, it provides assistance to its members in posting bail for traffic violations, licensing, auto ownership transfer and registration. It offers tour books, road maps, recreational information and a world travel service. Through its wholly owned subsidiary, the Interinsurance Exchange, the Club offers automobile and related insurance to its members. It sponsors automobile safety and educational programs, provides highway engineering studies, assists governmental agencies with respect to traffic, safety and other problems affecting motorists, and engages in extensive lobbying for or against legislation affecting the motoring public.

The Club has 12 directors, who serve without compensation. By and large those elected have been successful business and professional persons. They are elected for a three-year term, but the terms are staggered so that only four directors are elected each year.

## Summary of Litigation

In the first trial the plaintiffs, as members of the Club, sought to set aside the 1971 election of the board and sought a declaration of their voting rights. Plaintiffs challenged the validity of the Club's proxy solicitation methods and its election procedures. Plaintiffs attacked several of the misleading techniques used by Club management in soliciting general proxies for voting in Club elections. For example, persons who applied for Club membership by mail received an application form accompanied by an attachment requesting the applicant to "sign both sides." One side of the application was an application form; the other was a proxy. The trial court invalidated these proxies because the attachment obviously misled applicants into believing that they needed to execute both the application and the proxy if they wanted to join the Club. In *Braude* I the appellate court observed that the trial court's determination was "sound." (*Braude* v. *Havenner, supra,* 38 Cal.App.3d at p. 531.)

The appellate court in *Braude* I also agreed that certain Club election bylaws unreasonably restricted the members' right to nominate and hence to elect the directors. The nominating committee appointed by the Club's president prepared a list of nominees for directors containing only as many names as there were vacancies on the board. The list of nominees was not required by the bylaws to be disclosed until 15 days prior to the annual meeting, and notice thereof was given in an ineffective manner by publication in the Los Angeles Daily Journal. Members were permitted to nominate director candidates only at the annual meeting, after the meeting had been convened.

Plaintiffs also broadly challenged the fairness of the Club's election practices as a whole, and particularly the solicitation of general proxies for management at corporate expense. As a factual matter, the trial court in the first trial concluded that: ". . . 'considering all of the circumstances, the effect of defendant club's solicitation of proxies, failure to give any more than minimal legal notice of the meeting, failure to disclose nominees to be voted upon at the meeting, and the impracticality of any third person['s] being able to communicate effectively with the members of the club, all have the necessary result of perpetuating directors in office without affording to the members a fair opportunity to express their vote for other candidates if that is what a given member desires to do.'" (*Id.,* at p. 533.)

Nevertheless, because of equitable considerations, the trial court refused to invalidate the election.

On appeal in *Braude* I the court determined that the issue as to the validity of the election itself was moot because the contested terms of office expired

during the pendency of that appeal but refused to dismiss the appeal since it involved " 'the general public interest and the future rights of the parties, and there is a reasonable probability that the same questions will again be litigated and appealed, . . .' " (*Id.*, at p. 530.) The appellate court reversed the judgment with directions to "enter a new judgment determining that the electoral procedures which led to the selection of respondent directors were unfair and unlawful" and ordering the trial court to "retain jurisdiction as a court of equity to compel respondents [Club] to put into effect such new electoral process as the court may consider just and proper." (*Id.*, at p. 534.)

Following remand and a second trial, extensive findings of fact and conclusions of law were made, including the following:

" '25. The unvarying election as directors of those nominees chosen by the nominating committee, and the lack of any other nominees has been contributed to, at least in part, by each of the following factors:

" '(a) The existing procedures for nomination of candidates;

" '(b) The lack of reasonable means for master members seeking election to the Board of Directors to communicate with other master members;

" '(c) The inability of master members other than those who are members of the Board of Directors or who are employed by the Auto Club to have access to the proxy machinery heretofore used by the Auto Club in connection with the election of directors;

" '(d) The existence of proxies held by proxy holders appointed by the Auto Club, which proxies are intended to be and have been voted for nominees of the nominating committee;

" '(e) The use by the Auto Club of its own funds, employees, records and assets to solicit proxies, while denying such use to others seeking or who might desire to seek nomination.

" 'By reason of the foregoing, the master membership has been deprived of any fair or effective opportunity to participate influentially in the choice or selection of candidates for director or to vote for candidates for directors other than those nominated by the nominating committee.

" '26. There is no reasonable means presently provided by which a petition candidate may solicit proxies or votes except at his own expense.

" '27. The election procedure followed by the Auto Club is unfair and unlawful.' " (*Braude* v. *Automobile Club of Southern Cal.*, *supra*, 78 Cal.App.3d at pp. 185-186.)

On the second appeal the appellate court in *Braude* II observed the trial court's judgment was a "studied effort" to remedy a "fatal defect" in the "unfair and unlawful" Club nominating and voting procedures. Nevertheless, the trial judge's attempt to prescribe "an approved method by which the entire membership may participate in the vital function of electing its board of directors" erred in one respect—it forbade all use of proxies by the Club. (*Id.*, at p. 186.) *Braude* II therefore once again reversed and remanded the matter to the trial court, instructing it to "provide for a fair method of electing directors which includes the use of proxies." (*Id.*, at pp. 186-187.)

The court remanded the matter of an award of attorneys' fees to plaintiffs to be considered "when the litigation is finally terminated" (*id.*, at pp. 187-188), the court observing: "[T]he nature and extent of rights preserved and the benefits conferred can only be determined and assessed when the litigation is finally terminated. The status of the matter renders any attempt to bring the allowance of attorney's fees within any exception to the general rule of Code of Civil Procedure section 1021 not only tenuous but premature at this time." (*Id.*, at p. 187.)

Before the third trial the Legislature enacted in 1978 and revised in 1979 the nonprofit corporation law which includes nonprofit public benefit corporations (Corp. Code, div. 2, pt. 2, § 5110 et seq.) and nonprofit mutual benefit corporations (Corp. Code, div. 2, pt. 3, § 7110 et seq.). The new law modernizes and changes the law as it applies to California's 62,000 nonprofit corporations. The revisions are extensive. So far as the general provisions governing the election of directors is concerned, there is no doubt that *Braude* I and *Braude* II had a substantial influence on the general principles adopted by the Legislature. The Report of the Assembly Select Committee on Revision of the Nonprofit Corporations Code, pages 15-16 (1978 reg. sess.) states: "Recent cases[2] dealing with the election of directors of nonprofit corporations have found that election procedures were unfair as the members did not have a real voice in the election of directors. The new nonprofit law codifies case law by requiring that there shall be available to the members reasonable nomination and election procedures given the nature, size and operations of the corporation. Sections 5520 and 7520. [¶] The procedures must include, but are not limited to, a reasonable: (i) means of nominating persons for director; (ii) opportunity for a nominee

---

[2]Referring to *Braude* I and *Braude* II.

to communicate to the members the nominee's qualifications and the reason for the nominee's candidacy; (iii) opportunity for a nominee to solicit votes; and (iv) opportunity for all members to choose among the nominees. Sections 5520 and 7520.[6] . . . The crucial question is whether the election procedure is open given the nature, size and operations of the corporation. The procedures must not only be reasonable in form but in operation." Footnote 6 from the above quote is from the original report and reads as follows: "Various formulations of a general standard were considered. The final standard was derived from the trial court's holding in *Braude* v. *Automobile Club of Southern Cal.*, 78 Cal.App.3d 178, 144 Cal.Rptr. 169 (1978):

" 'Defendant Auto Club must adopt election procedures which provide each candidate with a reasonable opportunity and chance (a) to be nominated, (b) to make his candidacy, his qualifications and his reasons for seeking office known to the voting members, (c) to solicit proxies or votes, and (d) to be elected by an election procedure which does not operate in favor of any one candidate or group of candidates.' 78 Cal.App.3d at 185."

Corporations Code sections 5520 and 7520 adopted by the Legislature closely track *Braude* II in this regard.[3]

It appears, however, that the Legislature did not enact all of the guidelines contained in the *Braude* cases and that the comprehensive revisions of the law touched many areas not involved in this litigation.

Following *Braude* II and the 1978-1979 legislative revisions of the nonprofit corporation law, the Club revised its own bylaws. Numerous changes were made in the Club's election processes, including important changes in nominating procedures, campaign procedures and election procedures. These were precipitated by plaintiffs' efforts in this litigation and the leg-

---

[3]Corporations Code section 7520 provides:

"As to directors elected by members, there shall be available to the members reasonable nomination and election procedures given the nature, size and operations of the corporation. The procedures shall include:

"(a) A reasonable means of nominating persons for election as directors.

"(b) A reasonable opportunity for a nominee to communicate to the members the nominee's qualifications and the reasons for the nominee's candidacy.

"(c) A reasonable opportunity for all nominees to solicit votes.

"(d) A reasonable opportunity for all members to choose among the nominees.

"(e) Subject to the provisions of subdivisions (a), (b), and (d) of Section 7616, the superior court of the proper county shall enforce the provisions of this section."

With the exception of subdivision (e), Corporations Code section 5520 duplicates section 7520.

islative changes to the nonprofit corporation law. In addition, plaintiffs have obtained a judgment which, as affirmed herein, will outlaw the use of general proxies in contested board elections.

The revisions were approved by the trial court, except the court outlawed the use of general proxies in contested elections for the board.

### DISCUSSION

*Attorneys' Fees*

■ As a general rule attorney fee awards must be based either on a statute or on the agreement of the parties (§ 1021). On the basis of equitable considerations, three exceptions have developed. They are the "common fund," "substantial benefits," and "private attorney general" doctrines.

*Substantial Benefit Doctrine*

■ The substantial benefit principle has grown out of the common fund doctrine. That doctrine was summarized in *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 34 [141 Cal.Rptr. 315, 569 P.2d 1303]: "[W]hen a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund. [Citations.]" (See also *Winslow* v. *Harold G. Ferguson Corp.* (1944) 25 Cal.2d 274, 277 [153 P.2d 714].)

The substantial benefit principle extends the common fund doctrine to litigation which has not resulted in a pecuniary recovery but has resulted in substantial benefits to an identifiable class of persons. The court in *Save El Toro Assn.* v. *Days* (1979) 98 Cal.App.3d 544, 548 [159 Cal.Rptr. 577], succinctly described the doctrine: "The substantial benefit theory permits the award of fees when a litigant, suing in a representative capacity, obtains a decision resulting in the conferral of a substantial, actual and concrete, pecuniary or nonpecuniary benefit on the members of an ascertainable class, and the court's jurisdiction over the subject matter makes possible an award that will spread the costs proportionately among the members. The substantial benefits, like the common fund theory, rests on the principle that those who have been 'unjustly enriched' at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained." (See *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 943, 948 [154 Cal.Rptr. 503, 593 P.2d 200]; *Serrano* v. *Priest, supra,* 20 Cal.3d at pp. 38-43.)

The seminal case in this area upon which plaintiffs heavily rely is *Fletcher* v. *A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 319 [72 Cal.Rptr.

146]. In *Fletcher,* the plaintiffs brought a stockholders' derivative suit against the defendant A. J. Industries, Inc., and the president, treasurer and another member of the board of directors. The complaint alleged generally the president had dominated and controlled the board in the management of the corporation; that he had dominated and acted in concert with other named directors in several transactions which had occurred while all were members of the board and as a consequence the corporation had been damaged in various transactions which were detailed in the complaint. The cause was settled by stipulation, which included provisions that four incumbent directors were to be replaced immediately by persons acceptable to the plaintiffs and the employment of a new officer in charge of "operations." The president's voting power as a stockholder was limited, and his employment status was changed. Relief other than the above was to be settled by arbitration, including a prospective monetary recovery to the corporation.

The court extended the substantial benefit doctrine where no common fund in fact existed and held the substantial benefit theory could be applied to permit attorneys' fees to a successful party where the court finds that the result of the action maintained the health of the corporation, raised the standards of fiduciary relationship and other economic behavior or prevented an abuse which would have been prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to stockholder interest.

Obviously, many of the benefits mentioned by the court were conceptual, intangible and doctrinal in nature, though the actual change in the board of directors, the employment of a new officer in charge of "operations," and the change in the employment relationship of the president to the corporation were actual and concrete.

Insofar as the *Fletcher* language is restricted to the facts of the case as they relate to actual and concrete changes that occurred as a result of the litigation, the *Fletcher* case is consistent with the substantial benefit doctrine as applied in subsequent cases. However, beyond that point the substantial benefit principle has been impliedly modified by later Supreme Court and Court of Appeal cases as exemplified by the definition in *Save El Toro Assn.* v. *Days, supra,* 98 Cal.App.3d 544. ■ The mandate of *Save El Toro* and other cases directs that while the benefit can be pecuniary or nonpecuniary it must be actual and concrete and not conceptual or doctrinal and not merely the effectuation of a constitutional or statutory policy. Further, it is essential the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the award proportionately among the beneficiaries. (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at pp. 943, 945-948; *Serrano* v. *Priest, supra,*

20 Cal.3d at pp. 38-43; *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 433 [159 Cal.Rptr. 473].) As the court observed in *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* at page 945: "As we have seen, the substantial benefit doctrine rests on the principle of preventing *unjust* enrichment. . . .

"When the 'benefits' bestowed on others become less tangible and more ephemeral in nature, however, the equity in charging involuntary beneficiaries with the costs of obtaining such benefits on an unjust enrichment theory becomes more problematical. Although the named plaintiffs and others in the benefited class may place a high value on such intangible benefits, and thus may be more than willing to pay their share of the costs of procuring such benefits, other members of the benefited class may value such benefits differently, and may legitimately complain that they should not be involuntarily saddled with costs which are out-of-proportion to their perceived benefit. In such circumstances, insofar as an award of attorney fees is sought to be justified on notions of unjust enrichment, the justification fails."

A few examples will be helpful. In *Serrano* v. *Priest, supra,* 20 Cal.3d 25, the Supreme Court recognized that: "[P]laintiffs and their attorneys, as a result of the *Serrano* litigation, have rendered an enormous service to the state and all of its citizens by insuring that the state educational financing system shall be brought into conformity with the equal protection provisions of our state Constitution so that the degree of educational opportunity available to the school children of this state will no longer be dependent upon the taxable wealth of the district in which each student lives. We have concluded, however, that to award fees on the 'substantial benefit' theory on the basis of considerations of this nature—separate and apart from any consideration of actual and concrete benefits bestowed—would be to extend that theory beyond its rational underpinnings." (*Id.,* at p. 42, fn. omitted.)

"The fundamental holding of *Serrano*—i.e., that the existing school finance system, insofar as it operates to deny equality of educational opportunity to the school children of this state, is thereby violative of state equal-protection guarantees—does nothing in and of itself to assure that concrete 'benefits' will accrue to anyone." (*Id.,* at p. 41.)

*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, established that before approving a subdivision map local authorities must make specific findings that the subdivision is consistent with the applicable general plan, an important principle of law. The court held that these "stare decisis benefits" did not justify an award of fees under the substantial benefit theory. As the court stated: "Although 'it is a built-in consequence of [the Anglo-American principle of] stare decisis that "a legal

doctrine established in a case involving a single litigant characteristically benefits all others similarly situated"' [citations], the doctrine of stare decisis has never been viewed as sufficient justification for permitting an attorney to obtain fees from all those who may, in future cases, utilize a precedent he has helped to secure. [Citations.]" (*Id.*, at p. 946.)

The Supreme Court in *Woodland Hills* observed that such a case should be considered under the private attorney general doctrine rather than the substantial benefit doctrine. (§ 1021.5; see also *Save El Toro Assn. v. Days, supra,* 98 Cal.App.3d at p. 550.)

In *Rich v. City of Benicia, supra,* 98 Cal.App.3d 428, plaintiff successfully sued the city and several individuals to compel preparation of an environmental impact report in connection with a construction project. The benefit conferred was the effectuation of a statutory policy contained in the California Environmental Quality Act, and "this is not the kind of benefit to which the . . . substantial benefit theory[] should be applied." (*Id.*, at p. 433.)

In *Save El Toro Assn. v. Days, supra,* 98 Cal.App.3d 544, plaintiff successfully invalidated an assessment district and a subdivision on the ground the City of Morgan Hill had not adopted an open space plan pursuant to the Open Space Lands Act. The substantial benefit doctrine was held to be inapplicable because the action amounted to an effectuation of a statutory policy.

On the other hand, courts have authorized an award of attorneys' fees under the substantial benefit doctrine in a few cases where the benefits have been actual and concrete (see e.g., *Northington v. Davis* (1979) 23 Cal.3d 955 [154 Cal.Rptr. 524, 593 P.2d 221], wherein the taxpayer successfully challenged the location of a police helipad, saving the city $9,600 construction costs; *Mandel v. Hodges* (1976) 54 Cal.App.3d 596 [127 Cal.Rptr. 244, 90 A.L.R.3d 728], wherein the plaintiff, on constitutional grounds, successfully eliminated the Good Friday holiday, resulting in large monetary savings to the state).

█ Turning to the facts of the instant case, it is readily apparent that in one sense the adoption of the revised bylaws was an actual event. The bylaws were in fact adopted as a consequence of this litigation and the new nonprofit corporation law. However, the benefits to the membership and to the corporation from that adoption are not actual or concrete but are potential, conceptual, intangible and doctrinal in nature. The adoption of the new bylaws merely created the opportunity in the membership to effectuate some concrete changes in the management and policies of the corporation. █

As a matter of public policy, it is important that members of nonprofit corporations—particularly one of the Club's size and importance—have fair and reasonable election procedures, to the end that each member has a reasonable and fair opportunity to participate in management by being nominated and elected to the board. This important public policy has been recognized by the Legislature in a most dramatic way by the adoption of the revised nonprofit corporation law of 1978, particularly those portions dealing with fair and reasonable procedures in the corporate election process. (See Corp. Code, §§ 5520, 7520.) ▮▮▮ However, whether opening up the opportunity to participate in the election process will result in actual or concrete benefits to the Club remains a matter of speculation.

Moreover, the trial court expressly rejected the notion that the Club or its members actually benefited from the adoption of the bylaws. The trial court stated that there was no evidence that the prior system for selecting directors "was in any way detrimental to the financial or any other interest of the members." On the contrary, the court concluded and the record reflects that "the Club is an extremely well run business," the club has had an impressive record of growth in membership and assets, and that the undisputed testimony was that its operations have been conducted "effectively, efficiently, honestly." The testimony further showed that the Club has consistently selected directors who were "outstanding individuals," with experience in large and complex business enterprises. Indeed, the court specifically commented on the high quality of the Club's directors, noting that they were "fully qualified" and "demonstrated leaders of [the] community."

The court further observed that: "There is very little evidence of members being aggrieved by the prior state of affairs (the only such members to the court's knowledge being plaintiffs herein), . . ." The court expressed the thought that the "members are principally interested in its services. The preponderance of evidence suggests that the great majority of the members have little or no interest in its corporate affairs. The rights vindicated by this suit are apparently of little importance to the members."

Appellants' reliance upon *Coalition for L.A. County Planning etc. Interest* v. *Board of Supervisors* (1977) 76 Cal.App.3d 241 [142 Cal.Rptr. 766], *Mills* v. *Electric Auto-Lite Company* (1970) 396 U.S. 375 [24 L.Ed.2d 593, 90 S.Ct. 616], and *Hall* v. *Cole* (1973) 412 U.S. 1 [36 L.Ed.2d 702, 93 S.Ct. 1943] is misplaced. These cases were decided before *Woodland Hills* and subsequent California cases and, for the reasons we have stated, are no longer controlling on this point in this state. The Supreme Court recognized in *Woodland Hills* that since the adoption of section 1021.5 situations such as those in *Mills* v. *Electric Auto-Lite Company, supra, Hall* v. *Cole, supra,*

and *Coalition for Los Angeles County Planning* v. *Board of Supervisors, supra,* are more appropriately handled under the private attorney general principle and should no longer be treated under the substantial benefit doctrine. (See *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at pp. 947-948.)

Further, as we have pointed out, the broad language of *Fletcher* v. *A. J. Industries, Inc., supra,* 266 Cal.App.2d 313, has not survived *Woodland Hills* intact, though on the facts of that case there were some actual and concrete benefits which would justify an award of attorneys' fees under the substantial benefit doctrine.[4]

We conclude the trial court was correct in denying the award of attorneys' fees under the substantial benefit doctrine.

### Private Attorney General Doctrine

■ The private attorney general doctrine was codified by the enactment of section 1021.5 in 1977. That section states in relevant part: "[A] court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or non-pecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

As the court noted in *Woodland Hills, supra*: "[T]he fundamental objective of the private attorney general doctrine of attorney fees is ' "to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." ' [Citation.] The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]"

---

[4]Appellants, throughout their briefs, rely upon *Lewis* v. *Anderson* (9th Cir. 1982) 692 F.2d 1267. Insofar as that case holds that under the substantial benefit doctrine fees may be awarded "when important shareholder rights are successfully asserted" (*id.,* at p. 1271), without more, and without distinguishing actual and concrete benefits from doctrinal and conceptual benefits, and holds the California and federal law governing the substantial benefit doctrine is indistinguishable, the case does not accurately represent the law in California (*id.,* at p. 1270).

(*Woodland Hills Residents Association, Inc.* v. *City Council, supra,* 23 Cal.3d at p. 933.)

Initially, it must be noted that most of the limitations imposed on the application of the substantial benefit doctrine are not applicable to the private attorney general concept. Thus, the benefit may be conceptual or doctrinal and need not be actual and concrete; further, the effectuation of a statutory or constitutional purpose may be sufficient. As explained in *Rich* v. *City of Benicia, supra,* 98 Cal.App.3d at page 433: "The private attorney general theory is predicated upon achievement of benefits substantial from the viewpoint of the general public but too ephemeral from the standpoint of individual beneficiaries to warrant application of the substantial benefit theory. While the substantial benefit theory is based in concepts of unjust enrichment, the private attorney general theory seeks (without regard to material gain) to encourage vindication of strong public policies by private lawsuit. [Citations.]"

The benefit must inure primarily to the public. (*Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 835-836 [160 Cal.Rptr. 465].)

Thus, "the statute directs the judiciary to exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 935.) An effect upon the public interest is generally considered to require an impact on persons other than those directly involved. (*Marini* v. *Municipal Court, supra,* 99 Cal.App.3d at pp. 835-836.)

Practically all of the section 1021.5 cases involve a public entity as a defendant; however, such fees may be awarded if, as in the instant case, a private party is the only defendant. (*Franzblau* v. *Monardo* (1980) 108 Cal.App.3d 522 [166 Cal.Rptr. 610].)

Some examples of the enforcement of important rights affecting the public interest, resulting in significant nonpecuniary benefits being conferred upon the general public or a large class of persons, are: (1) the enforcement of constitutional rights requiring that financing be equalized among school districts in California (*Serrano* v. *Priest, supra,* 20 Cal.3d 25); (2) requiring compliance with the California Environmental Quality Act by proper submission of an environmental impact report (*Rich* v. *City of Benicia, supra,* 98 Cal.App.3d 428); (3) ordering that a subdivision map conform to a general plan (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 917); (4) directing the adoption of an open space plan as required by statute (*Save El Toro Assn.* v. *Days, supra,* 98 Cal.App.3d 544); (5) judgment vindicating rights to unemployment benefits

(*Gunn* v. *Employment Development Dept.* (1979) 94 Cal.App.3d 658 [156 Cal.Rptr. 584]); (6) judgment vindicating jail inmates' rights to reasonable exercise periods (*Daniels* v. *McKinney* (1983) 146 Cal.App.3d 42 [193 Cal.Rptr. 842]).

 In the instant case the trial court found that there was no "fund" or "recovery" as a result of the litigation out of which fees could be paid and found the cost of prosecuting the action in terms of time and effort required by plaintiffs' attorneys substantially outweighed the plaintiffs' individual interest in the rights vindicated by the litigation. Thus, subdivisions (b) and (c) of section 1021.5 are satisfied. The crucial remaining question therefore is whether the litigation "resulted in the enforcement of an important right affecting the public interest," resulting in "a significant benefit, whether pecuniary or nonpecuniary," being "conferred on the general public or a large class of persons."

The court found that the rights vindicated affect "a large class of persons" in that there are 1.8 million members of the Club. The court further found that: "This lawsuit has vindicated the right and ability of the members of the Auto Club to have a reasonable opportunity to be nominated and elected to the Club's Board of Directors and the right and ability to elect directors, other than those nominated by management, if that is their desire. Prior to the institution of this lawsuit, the members had no opportunity to be nominated and elected to the Club's Board of Directors (unless they were nominated by management). This lawsuit has also achieved for the members a reasonable opportunity for a nominee to communicate to the members his qualifications and the reasons for his candidacy, a reasonable opportunity for all nominees to solicit votes, and a reasonable opportunity for all members to choose among the nominees. While the plaintiffs did not effect directly each of the changes made in the Club's by-laws over the years with respect to the procedure for nominating and electing directors and did not obtain all of the changes they sought, the Club's present by-laws and procedures for the nomination and election of directors were heavily influenced by the plaintiffs' efforts in this litigation as well as the need to conform to the new Nonprofit Corporations Code."

 Fair and reasonable election procedures are fundamental to the proper governance of not only "for profit" corporations but "nonprofit" corporations, including labor unions. The members of such bodies should have a reasonable opportunity to be nominated and elected to the board of such an entity. These rights are important rights affecting the public interest. The Legislature gave signal recognition to the significant public importance of the right of all members of nonprofit corporations to a fair and reasonable election procedure in the election of the board of directors by the enactment of sections 5520 and 7520 of the Corporations Code. As a result of that

adoption, all of approximately 62,000 nonprofit corporations in California will be required to have fair and reasonable procedures for the election of directors. ■■■ In this case the enforcement of these rights by reason of this litigation has not only significantly benefited the Club and its members in a doctrinal and conceptual sense, but has in addition significantly benefited the public through the precedential effect of *Braude* I and *Braude* II and by reason of the substantial influence that this litigation has had upon the enactment of the new nonprofit corporation law.

Thus, the right to have fair and reasonable election procedures in nonprofit corporations in terms of its "relationship to the achievement of fundamental legislative goals" (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 936) is an important right conferring significant benefits upon a large class of persons and upon the public.

In arriving at a contrary conclusion,[5] the trial court relied heavily upon the lack of any actual beneficial effect of the adoption of the bylaws upon the Club's operation or upon its members, the indifference of the members to being involved in the management of the corporation and the excellence of the management the corporation had always enjoyed. (See specifically a summary of the court's findings in this regard under the *Substantial Benefit Doctrine* discussion at p. 1005, *ante.*)

■■■ However, the important public right here being vindicated is doctrinal and conceptual in nature—not necessarily actual and concrete. Whether actual or concrete benefits were in fact conferred, whether the members or the corporate management were indifferent to the doctrinal benefits to the Club and its membership and whether the board or Club members opposed or supported the change is of no importance.[6] ■■■ Accordingly, the trial court erred in relying upon a lack of concrete or actual benefits as a predicate for finding the plaintiffs are not entitled to an attorneys' fee under the private attorney general principle.

---

[5] The trial court found: "The right vindicated in this suit is not important to the public, and does not affect the public interest."

[6] An illustration may be helpful. Assume an all-male statewide service club is ordered by a court, over the objection of a near unanimous membership vote, to admit women to membership. The order is based upon a strong public policy enunciated in statute, with strong constitutional overtones prohibiting discrimination on account of sex. Could the club be required to pay the plaintiffs' attorneys' fees under the private attorney general doctrine? Without question the court order vindicates a strong public right conferring significant conceptual and theoretical benefits upon the club, society and its membership.

All but a handfull of members of the club vehemently argue there is no actual benefit to the club and opposed the change. Nevertheless, doctrinally and conceptually the court has decided there are important benefits to society and the club to eliminate discrimination and improve the opportunities of women to participate with men on an equal basis. These doctrinal benefits are not actual and concrete. The fact that the near unanimous members of the club oppose them, in our opinion, would be unimportant to the issue.

We are, of course, well aware of the deference this court must show to the trial court's determination. (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 354-355 [188 Cal.Rptr. 873, 657 P.2d 365].) However, as stated in *Westside Community for Independent Living, Inc., supra*: "Nevertheless, trial court discretion is not unlimited. ██ 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' [Citations.]" (*Id.,* at p. 355.) The validity of the judge's conclusion that there was no important public right or right affecting a large class of persons was undercut by his erroneous reliance upon the lack of actual or concrete benefits. Accordingly, we will reverse the judgment so far as it denies attorneys' fees under the private attorney general doctrine.

### Cross-appeal

The Club cross-appealed from that part of the court's finding and judgment invalidating section 8(a)1(a) and section 6 of the Club's bylaws authorizing the solicitation and voting of general proxies by the board in contested board elections. ██ ██ ██ ██ The court found these provisions were unreasonable in their application and do not afford a member a reasonable and fair opportunity to be nominated and elected to the board.[7]

The Club argues that the trial court abused its discretion in prohibiting the use of general proxies in contested elections without giving the Club an opportunity to submit an alternative procedure. Thus the Club does not directly attack the trial court's authority to outlaw the use of the general proxy in contested elections. ██ Indeed, while the nonprofit Corporations Code does not prohibit the use of general proxies, the election procedures are still subject to the requirement of reasonableness. (Corp. Code, §§ 7520, 7522, subd. (c), 7616, subd. (d).) The comments of the trial court make clear that the judge was aware of this when he declared the use of the general proxy invalid in contested elections because the provision "is unreasonable in its practical application."

As the court in *Braude* I observed: "Corporations have no power to create bylaws that are unreasonable in their practical application (*People's Bank* v. *Superior Court* (1894) 104 Cal. 649, 652 [38 P. 452]); bylaws seemingly in compliance with statutory provision are invalid if they are unreasonable." (*Braude* v. *Havenner, supra,* 38 Cal.App.3d at p. 533.) Thus the court is the ultimate arbiter as to the legality of the bylaws adopted.

---

[7] A general proxy does not list nominees and therefore gives the proxy holder general discretion in voting.

What the Club really objects to is the fact the trial judge did not give the Club a third chance to deal with the use of the general proxy in board elections. The court in both *Braude* I and *Braude* II indicated the use of the general proxy in board elections contributes to unfair elections. Nevertheless, the Club after remand of *Braude* II revised its bylaws so as to permit their use.

What the appellate court in *Braude* II objected to was the trial court's rewriting the Club's bylaws. But *Braude* II also ordered the trial court to scrutinize any further revisions of the bylaws and give "approval to a fair and legal method for the election of directors satisfactory to both management and membership." (*Braude* v. *Automobile Club of Southern Cal., supra,* 78 Cal.App.3d at p. 187.)

In addition, it is important to note that unlike the situation in *Braude* II, wherein the appellate court condemned the trial court's action in forbidding all use of proxies in the election of directors, in the instant matter the trial court prohibited only as unreasonable the use of general proxies in the election of directors in *contested elections.* This was similar to the findings in the first trial and which the appellate court in *Braude* I observed was "sound." (*Braude* v. *Havenner, supra,* 38 Cal.App.3d at p. 531.)

The court at the third trial did not rewrite the Club's election bylaws in violation of *Braude* II but simply declared unreasonable and invalid the bylaw provision which permitted management to vote a general proxy in contested elections. The court was not required to follow a procedure by which prior disapproval of the general proxy would be circumvented by permitting the Club another opportunity to submit a proposal pertaining to the use of general proxies.

The judgment is reversed insofar as it holds the trial court did not have authority to award attorney fees pursuant to section 1021.5. The judgment is otherwise affirmed. The cause is remanded to the trial court for the purpose of fixing a reasonable attorneys' fee to be awarded to the plaintiffs' attorneys.

Plaintiffs to recover their costs on appeal.

Franson, J., and Best, J., concurred.

A petition for a rehearing was denied April 9, 1986. Franson, J., was of the opinion that the petition should be granted. The petition of defendant and appellant for review by the Supreme Court was denied May 28, 1986.