[No. D002708. Fourth Dist., Div. One. Apr. 21, 1986.]

PHYLLIS C. FERRY et al., Plaintiffs and Appellants, v.
SAN DIEGO MUSEUM OF ART, Defendant and Respondent.

COUNSEL

Bamberg & James and Daniel F. Bamberg for Plaintiffs and Appellants.

Gray, Cary, Ames & Frye, David E. Monahan and Marcelle E. Mihaila for Defendant and Respondent.

## OPINION

JONES, J.*—Appellants Phyllis C. Ferry and Charles H. Cutter (Plaintiffs) are members of respondent San Diego Museum of Art (Museum). They brought a declaratory relief action challenging the Museum's amendment of its bylaws on June 27, 1980, terminating all voting rights of its members. Their amended complaint set forth various theories which they claimed entitled them to relief, which may be briefly described as follows: (1) Corporations Code[1] section 5341 applied to the vote termination, and its requirements were not met; (2) the amendment procedure was so unfair and unreasonable as to be invalid; (3) the separate vote of life members voting as a class should have been allowed; (4) violations of sections 5610 and 5612 occurred pertaining to the way in which members' spouses were allowed to vote.

After various preliminary skirmishes, Museum moved for summary judgment, and Plaintiffs opposed the motion and cross-moved for summary judgment in their favor. After hearing oral argument, Judge Levitt stated he would grant partial summary adjudication in Museum's favor on Plaintiffs' first two causes of action, but not on the third cause. He also indicated he thought the cross-motion had no merit.

This ruling was ambiguous because Plaintiffs had not framed their complaint to state three causes of action, and they had stated more than three theories of recovery.

Some months later, the parties stipulated to entry of judgment in favor of Museum. First, they stipulated Judge Levitt's ruling had found to be without substantial controversy two issues: (1) the statutory claim (i.e., he found section 5341 did not apply) and (2) the life members' approval claim. They further stipulated the one remaining issue, spousal voting, was dismissed with prejudice as to Plaintiffs. They finally stipulated judgment be entered for Museum; Plaintiffs' right to appeal Judge Levitt's original ruling "is not adversely affected" by the dismissal with prejudice; and Plaintiffs may appeal that order.

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Corporations Code unless otherwise specified.

Plaintiffs then appealed from the final judgment in favor of Museum entered upon the stipulation.

## FACTS

As part of the new nonprofit corporations law effective January 1, 1980, section 5310, subdivision (a), permits a nonprofit corporation to choose to have no voting members. (§ 5056, subd. (a), defines a "member" as a person with voting privileges.) After enactment of this statute, certain trustees and officers of Museum decided to attempt to amend Museum's bylaws to eliminate voting memberships, as the new statute permitted, in order to reduce operating expenses and procedural formalities. Plaintiffs are among the members who opposed the proposed elimination of voting memberships.

Museum is a California nonprofit "public benefit" corporation under the new law. It acquires and exhibits art and sponsors educational and related programs to advance art appreciation, study, preservation and exhibition. Its assets are irrevocably dedicated to charitable purposes and it is entitled to both federal and state tax exemptions.

Plaintiffs allege in their complaint that from December 29, 1979, when Museum's counsel first suggested amending the bylaws to eliminate voting memberships, until May 22, 1980, when that change was formally put before the membership (by mailed notice proposing the bylaw change), Museum officers and trustees engaged in a course of conduct to revise the bylaws secretly without informing the membership of their activities and the significance of the revision. They contend on December 29, 1979, Museum counsel Sterrett wrote a letter to Museum president Muzzy, suggesting elimination of voting; Muzzy in turn circulated this letter to the trustees and the matter was discussed at the January 29, 1980, board meeting. A bylaw revision committee was established. Neither the existence nor the purpose of the committee was disclosed to the membership. Further, on February 29, 1980, the board adopted a new policy limiting access to the minutes of meetings of the executive committee and the board; a member could review such minutes only with permission of Museum's president. Further, according to deposition testimony of a member of the revision committee, Mrs. Walbridge, the president "probably" told the trustees not to discuss the bylaw revisions with the membership. (Museum admits the restriction of access to minutes but claims the motivation was unrelated to the bylaw amendment but instead involved unfavorable press coverage in an unrelated area.)

On May 7, 1980, a meeting of Museum's volunteer council took place. Trustees Bildsoe, Walbridge and Showley were present. According to plain-

tiff Cutter's recollection, Bildsoe and Walbridge, both members of the by-law revision committee, were asked if they would like to discuss the new bylaws and responded they would not.

Further, Bildsoe on May 13, 1980, instructed the person then preparing Museum's June 1980 monthly calendar not to use the term "elimination" in referring to membership voting rights in the notice to be given of the special meeting scheduled for June 3, but rather to use the "more positive" terminology that the vote now held by membership would be vested in the board of trustees instead.

On May 22, 1980, the monthly calendar for June was mailed, containing a notice of a June 3, 1980, special meeting to amend Museum bylaws. The calendar was sent by first class postage rather than bulk rates so as to provide the statutorily required 10-day notice of the bylaw amendment. (See § 5511, subd. (a).)

After receiving the monthly calendar containing the notice of the proposed special meeting to revise the bylaws, plaintiff Cutter attempted to avail himself of the opportunity stated in the notice to inspect the proposed amended and restated bylaws. The Museum director's executive secretary told Cutter he would be limited to 10 minutes to review the documents. He was not offered a copy of the old bylaws for comparison purposes. He was dissatisfied with the situation and requested access to the recent minutes of the meeting of the board of trustees. His request was denied, according to the secretary, based on a new policy adopted following the February 1980 trustees meeting, restricting access of Museum members to such information without prior approval of the president.

On May 27, 1980, legal counsel for Museum (Sterrett) and the executive director (Brezzo) solicited proxies in favor of the bylaw amendment at a meeting of Museum's artists guild, and Cutter and other members solicited opposing proxies. On May 30, 1980, the special meeting of June 3 was cancelled. Cutter offers evidence that the meeting was cancelled because Museum officers feared the bylaw revision would lose at that point. Museum disagreed with this interpretation, taking the position the postponement was to permit fuller notice and more adequate airing of the issues. Museum did not mail notice of cancellation, but rather relied on the press for notification. The bylaw revision election was delayed until the annual meeting of June 27, 1980. Specific notice of that fact was not given; rather, the Museum relied on its proxy solicitation of June 6, 1980, a mailing requesting votes on the voting rights termination issue. These materials did not highlight the fact that a voting rights termination was involved but did provide in ordinary type, "Revisions will also eliminate the need for a membership vote when

technical amendments are required." Further, at the end of a set of questions and answers on the proposed bylaws was stated, "The new law provides for the first time that voting rights held by members may be vested solely in Trustees," and the proxy itself recited that the change would vest voting rights now held by Museum membership in the board of trustees. Finally, the June 6 mailing provided that members could look at the new bylaws in the rotunda of the Museum during Museum hours.

On June 5, 1980, Cutter and others requested their opposing materials be included in the June 6 mailing. Their request was refused. Cutter also requested a list of the names and addresses of Museum members; that was not provided until June 12, 1980. Cutter contends he was not able to mail out the opposing materials until June 19.

On June 27, 1980, the bylaw revision election took place and the members approved the revised bylaws by a vote of 1,618 to 1,274.

## AGREED MATTERS

The parties do not dispute the following propositions:

1. Sections 5510, 5511 and 5512 set forth required steps to conduct an election materially revising the bylaws and affecting membership rights. The requirements of these statutes (including that notice be not less than 10 nor more than 90 days) were met.

2. The requirements of section 5341, subdivision (c), governing notice and hearing procedure for expulsion, suspension, or termination of corporate members, were not met.

3. The parties disagree as to whether section 5341, which requires a fair and reasonable procedure, applies, but they do agree that a fair and reasonable procedure is *required*. Museum contends the bylaw revision amendment process was in good faith, fair and reasonable, and Plaintiffs contend the opposite.

## ISSUE

The issue is whether judgment on the pleadings in favor of Museum was properly entered. We conclude, for reasons we shall state, that section 5341 does apply, contrary to the trial court's ruling, and therefore the judgment must be reversed.

## Applicability of Section 5341

 Plaintiffs present the novel and interesting question whether section 5341 (effective Jan. 1, 1980, as part of the revision of the part of the Corp. Code applicable to nonprofit or public benefit corporations) governs an amendment of corporate bylaws to eliminate membership voting rights.[2] The statute specifically applies to expulsion, suspension, or termination of membership rights, prescribing a specific procedure and also providing that any such expulsion, suspension, or termination must be done in good faith and in a fair and reasonable manner. Procedures complying with the statute (particularly, subd. (c) thereof) are presumptively fair, but a court may also find other procedures fair and reasonable.

Section 5341 does not expressly govern amendments of bylaws nor removal of voting rights. Plaintiffs argue, however, that termination of voting

---

[2]The statute provides:

"(a) No member may be expelled or suspended, and no membership or membership rights may be terminated or suspended, except according to procedures satisfying the requirements of this section. An expulsion, termination or suspension not in accord with this section shall be void and without effect.

"(b) Any expulsion, suspension or termination must be done in good faith and in a fair and reasonable manner. Any procedure which conforms to the requirements of subdivision (c) is fair and reasonable, but a court may also find other procedures to be fair and reasonable when the full circumstances of the suspension, termination, or expulsion are considered.

"(c) A procedure is fair and reasonable when:

"(1) The provisions of the procedure have been set forth in the articles or bylaws, or copies of such provisions are sent annually to all the members as required by the articles or bylaws;

"(2) It provides the giving of 15 days prior notice of the expulsion, suspension or termination and the reasons therefor; and

"(3) It provides an opportunity for the member to be heard, orally or in writing, not less than five days before the effective date of the expulsion, suspension or termination by a person or body authorized to decide that the proposed expulsion, termination or suspension not take place.

"(d) Any notice required under this section may be given by any method reasonably calculated to provide actual notice. Any notice given by mail must be given by first-class or registered mail sent to the last address of the member shown on the corporation's records.

"(e) Any action challenging an expulsion, suspension or termination of membership, including any claim alleging defective notice, must be commenced within one year after the date of the expulsion, suspension or termination. In the event such an action is successful the court may order any relief, including reinstatement, it finds equitable under the circumstances, but no vote of the members or of the board may be set aside solely because a person was at the time of the vote wrongfully excluded by virtue of the challenged expulsion, suspension or termination, unless the court finds further that the wrongful expulsion, suspension or termination was in bad faith and for the purpose, and with the effect, of wrongfully excluding the member from the vote or from the meeting at which the vote took place, so as to affect the outcome of the vote.

"(f) This section governs only the procedures for expulsion, suspension or termination and not the substantive grounds therefor. An expulsion, suspension or termination based upon substantive grounds which violate contractual or other rights of the member or are otherwise unlawful, is not made valid by compliance with this section."

rights effectively terminates an important membership right within the statutory language. (§ 5341, subd. (a).) They further argue the specific procedures of section 5341 were not followed (which claim is not disputed) and that the procedures followed were not fair or reasonable as the statute requires.

Additionally complicating this issue is the enactment, after the events here in dispute, of section 5342 (enacted in 1982) which specifically governs the termination of all memberships by bylaw amendment.[3] Section 5342 specifically provides: "The provisions of Section 5341 shall not apply to termination of all memberships or any class of memberships pursuant to an amendment of the articles or bylaws." (§ 5342, subd. (g).)

At the time of the instant bylaw amendment, section 5342 did not exist. Plaintiffs argue, however, before section 5342 was enacted, section 5341 applied to bylaw amendments terminating voting rights (because removing voting rights terminates a membership right) and section 5342 was enacted to change this result, to articulate different due process standards for terminating entire classes of membership by bylaw revisions. Museum argues section 5341 was never intended to apply to bylaw amendments; before section 5342 there was no specific statute regulating that process; and section 5342 was enacted to fill that vacuum. The legislative history of section 5341 is not helpful in shedding light on whether that statute was intended to apply in this situation,[4] and no other helpful history has been offered.

---

[3]Section 5342 provides:

"(a) An amendment of the articles or bylaws which would terminate all memberships or any class of memberships shall meet the requirements of this part and this section.

"(b) Before such an amendment is adopted the corporation shall give written notice to members not less than 45 nor more than 90 days prior to any vote by the members on the amendment. The written notice shall describe the effect of the amendment on the corporation and the members.

"(c) Any such amendment shall be approved by the members (Section 5034).

"(d) The articles or bylaws may impose additional requirements regarding termination of all memberships or any class of memberships.

"(e) Upon request of a member the corporation shall provide at its option the rights set forth in either paragraph (1) or (2) of subdivision (a) of Section 6330 as soon as reasonably possible to allow the member to communicate with other members regarding the proposed amendment.

"(f) Any such amendment shall terminate the rights members have pursuant to this part as members (Section 5056).

"(g) The provisions of Section 5341 shall not apply to termination of all memberships or any class of memberships pursuant to an amendment of the articles or bylaws."

[4]The legislative history of section 5341 offered in evidence below was the Report of the Assembly Select Committee on Revision of the Nonprofit Corporations Code, page 16 (Aug. 27, 1979). In this report, prepared to aid the Legislature in voting on the new nonprofit corporation law, it stated the chapter where section 5341 is located "codifies current case law concerning the procedural due process required for suspending or expelling members." This statement makes clear the application of section 5341 to membership expulsion, as well

Museum's basic argument as to the inapplicability of section 5341 is the statutory language does not refer to bylaw amendments nor voting rights, but a later enacted statute (§ 5342, *supra*) does refer to those matters, showing the Legislature originally did not intend to cover such situations in section 5341. Also, Museum says it would be impractical and unrealistic to try to apply section 5341 to bylaw amendments terminating voting rights of an entire class. Supporting that last argument, Museum says section 5341 requires 15 days notice of the expulsion, with the reasons therefor, and also mandates an opportunity for the member to be heard not less than 5 days before the effective date of expulsion. It is ludicrous, Museum argues, to expect such procedures to be followed when dealing with a situation of the entire membership of the corporation, here involving more than 5,000 members. More than 5,000 hearings and adjudications would then be required. Museum says the Legislature obviously could not have intended such a result, an argument which the trial court accepted.

Plaintiffs counter, however, that although obviously the specific procedures required by section 5341, subdivision (c), cannot be applied in this context, nevertheless the statute's basic requirement of good faith and reasonable procedure does apply, and to that extent there is no problem in concluding the statute governs mass termination of membership voting rights. Further, they point out the termination of voting rights is obviously a termination of membership, since the new nonprofit corporation law defines a member as one entitled to vote. (See § 5056, subd. (a).) Also they say the amended bylaws clearly state the Museum's "members" are now the trustees, who have the voting power, and no one else.[5] Accordingly,

---

as the intent to perpetuate the extensive precedent extant on that issue, but it does not resolve the ambiguity whether removal of voting privileges was considered the functional equivalent of loss of membership.

[5]The revised bylaws provide:

"ARTICLE IV

"*Membership*

"Section 1. *Members.* The Museum shall have no statutory or voting members. Any action which would otherwise require approval by a majority of all members or approval by the members shall require only approval of the Board of Trustees. All rights which would otherwise vest in members shall vest in the Trustees. Nothing in this Article IV shall be construed as limiting the right of the Museum to refer to persons associated with it or persons specified in Section 2 below as "Members" even though such persons are not members within the meaning of Section 5056 of the California Public Benefit Corporation Law, and reference to such persons as Members shall not make them statutory members. The Museum may confer by amendment of its Articles of Incorporation or of these Bylaws some or all of the rights of a member, as set forth in the California Public Benefit Corporation Law, upon any person or persons who do not have the right to vote for the election of Trustees or on a disposition of substantially all of the assets of the Museum or on a merger or on a dissolution or on changes to the Museum's Articles of Incorporation or Bylaws, but no such person shall be a member within the meaning of Section 5056.

"Section 2. *Classes of Members.* Each person or firm that contributes money, securities, works of art or other property to the Museum or in trust for the use of the Museum shall

they conclude loss of voting rights is tantamount to loss of membership, hence section 5341 applies, or alternatively, loss of voting rights equals termination of a membership right, within section 5341, subdivision (a).

## FAIRNESS AND REASONABLENESS

Plaintiffs argue section 5341 applies in requiring a good faith, fair and reasonable termination of membership rights, even though the specific due process requirements of subsection (c) are not applicable to a large scale elimination of rights as we have here. We agree. The statute clearly by its terms applies to the removal of a membership right, and the franchise is obviously a membership right. Further, as suggested by its legislative history, *supra,* and by its explicit requirement of a good faith, fair and reasonable procedure (§ 5341, subd. (b)), the statute codifies such precedent as *Braude* v. *Havenner* (1974) 38 Cal.App.3d 526 [113 Cal.Rptr. 386], where the court determined the procedures leading to the election of directors of the Automobile Club of Southern California were unfair, vitiating the election, and therefore mandated the superior court to declare the election unlawful and to retain equitable jurisdiction to compel the institution of new, fair procedures. The court in *Braude* said the "ultimate governing interest [in a nonprofit corporation] rests with members rather than with shareholders" (38 Cal.App.3d at p. 530), and a member has an equitable remedy to challenge an unfair corporate election.[6]

In addition to the first *Braude* decision,[7] a long line of decisions articulate the fiduciary responsibility of public service organizations to their members and the procedural safeguards required before individuals may be expelled from membership in such organizations. (E.g., *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 552-553 [116 Cal.Rptr. 245, 526 P.2d 253]; *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623 [114 Cal.Rptr. 681]; see generally, Tobriner & Grodin,

---

be a "Member." Members shall enjoy such benefits, rights and privileges as the Board of Trustees may from time to time determine. Each Member shall belong to one of the following classes: . . . ."

[6]That remedy was then prescribed by former section 2238, whose present equivalent, for nonprofit corporations, is section 5617, establishing an action to determine validity of the election or appointment of directors. Here, however, that statute technically does not apply because we deal not with a directors' election but with a bylaw amendment. The statute governing bylaw amendments, however, section 5511, is similar in providing "A court may find that notice not given in conformity with this section is still valid, if it was given in a fair and reasonable manner" (§ 5511, subd. (g)), which language similarly confers equitable jurisdiction on the court to determine the fairness of procedures followed.

[7]The first *Braude* decision, 38 Cal.App.3d 526 (*Braude I*), has been followed by two later decisions involving that litigation: *Braude* v. *Automobile Club of Southern California* (1978) 78 Cal.App.3d 178 [144 Cal.Rptr. 169] (*Braude II*), and *Braude* v. *Automobile Club of Southern California* (1986) 178 Cal.App.3d 994 [223 Cal.Rptr. 914], *infra* (*Braude III*).

The Individual and the Public Service Enterprise in the New Industrial State (1967) 55 Cal.L.Rev. 1247, 1260; Sloss & Becker, The Organization Affected with a Public Interest and Its Members . . . (1977) 29 Hastings L.J. 99.) ▇ The most recent decision in the Braude matter, approving an award of attorney fees on a public interest theory, stresses the vital importance of fair election procedures in nonprofit corporations: "Fair and reasonable election procedures are fundamental to the proper governance of not only 'for profit' corporations but 'nonprofit' corporations, including labor unions. The members of such bodies should have a reasonable opportunity to be nominated and elected to the board of such an entity. These rights are important rights affecting the public interest. The Legislature gave signal recognition to the significant public importance of the right of all members of nonprofit corporations to a fair and reasonable election procedure in the election of the Board of Directors by the enactment of sections 5520 and 7520 of the Corporations Code. As a result of that adoption, all of approximately 62,000 nonprofit corporations in California will be required to have fair and reasonable procedures for the election of directors. In this case the enforcement of these rights by reason of this litigation has not only significantly benefited the Club and its members in a doctrinal and conceptual sense, but has in addition significantly benefited the public through the precedential effect of Braude I and Braude II and by reason of the substantial influence that this litigation has had upon the enactment of the new nonprofit corporation law. [¶] Thus, the right to have fair and reasonable election procedures in nonprofit corporations in terms of its 'relationship to the achievement of fundamental legislative goals' [citation] is an important right conferring significant benefits upon a large class of persons and upon the public." (Braude v. Automobile Club of Southern California, supra, 178 Cal.App.3d 994, 1012-1013.)

### SUMMARY AND CONCLUSION

▇ We have no doubt, nor does Museum contend otherwise, both before and after enactment of the new nonprofit corporations law, nonprofit organizations were charged with the duty of fair and reasonable procedures with respect to their members. The principles of the cases cited by Plaintiffs, such as the Braude decisions, are broad enough to establish that duty.

These requirements are codified in section 5341, which governs this matter.

We also note that although Plaintiffs assert no claim under section 5511, which generally governs bylaw amendment procedures, the statute has language implying the right to a fair and reasonable procedure. (§ 5511, subd. (g): "A court may find that notice not given in conformity with this section

is still valid, if it was given in a fair and reasonable manner.") Although the specific requirements of section 5511 were met here, that statute does not create a "safe harbor"; it does not specify that all procedures complying with its specific provisions are valid. Accordingly, procedures which meet section 5511's notice requirements may nevertheless be unfair and unreasonable, as for example where the notice is timely but misleading or deceptive.

Because the question of whether Museum's election procedures here were fair and reasonable is factual in nature, summary adjudication was inappropriate. The judgment for Museum cannot stand.

Judgment reversed.

Staniforth, Acting P. J., and Butler, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 9, 1986.