[No. B189031. Second Dist., Div. One. Aug. 13, 2007.]

ANTHONY ESTRADA et al., Plaintiffs and Appellants, v.
FEDEX GROUND PACKAGE SYSTEM, INC., Defendant and Appellant.

2

## Counsel

Law Offices of Ellen Lake, Ellen Lake; Leonard Carder, Lynn Rossman Faris and Beth A. Ross for Plaintiffs and Appellants.

Seyfarth Shaw, James M. Nelson; O'Melveny & Myers, Walter Dellinger, Robert M. Schwartz, Chris A. Hollinger and Jonathan D. Hacker for Defendant and Appellant.

## OPINION

**VOGEL, J.**—Three drivers brought this class action against FedEx Ground Package System, Inc., contending that, for the limited purpose of their entitlement to reimbursement for work-related expenses, they were employees, not independent contractors. They sought reimbursement and declaratory and injunctive relief, and obtained class certification for their reimbursement claim. In a trifurcated trial, the court found the drivers were employees within the meaning of Labor Code section 2802 (Phase I), ordered FedEx to reimburse some (about $5 million, including prejudgment interest) but not all of their expenses (Phase II), granted most of the equitable relief sought by the drivers (Phase III), and ordered FedEx to pay the drivers' costs and attorneys' fees (about $12.3 million).

This is the third appeal in this case. In *Estrada I,* we held that orders dismissing some potential class members were not appealable, and dismissed the appeal as premature. (*Estrada v. RPS, Inc.* (2005) 125 Cal.App.4th 976 [23 Cal.Rptr.3d 261] (*Estrada I*).) In *Estrada II,* we reversed all of the equitable orders, resolving those issues against the drivers and in favor of FedEx. (*Estrada v. FedEx Ground Package System, Inc.* (Nov. 22, 2006, B187951) [nonpub. opn.] (*Estrada II*).) On this appeal, we consider FedEx's challenges to the trial court's class certification order, the court's Phase I finding that the drivers are employees, its Phase II reimbursement awards, and its posttrial attorneys' fee award.[1] On the drivers' cross-appeal, we consider their challenges to limitations imposed on the Phase II reimbursement awards and to the pretrial orders dismissing potential class members (the issue prematurely before us in *Estrada I*). We affirm the finding that the drivers are employees, the certification order, and the finding that attorneys' fees are recoverable, but reverse the fee award because the amount must be reconsidered, reverse two orders limiting the scope of reimbursable expenses, and remand to the trial court for further proceedings and recalculation of the attorneys' fee award.

---

[1] The trial court defined the certified class to include present and former drivers who personally perform or performed pickup and delivery services for FedEx on a full-time basis in a single work area or route (SWA's). Drivers who operate or operated in multiple work areas or routes (MWA's), corporate entities, and others were excluded from the class. Two of the three named plaintiffs (Anthony Estrada and Jeffrey Morgan) were SWA's; the third named plaintiff (Harvey Roberts) was an MWA and was dismissed on that ground (he is not a party to this appeal). In the end, we are dealing with only the SWA's on appeal and we thus refer to them as drivers except when necessary to distinguish between SWA's and MWA's, and for simplicity use only masculine pronouns.

## FACTS[2]

### A. *The Evidence at Trial*

#### 1. *The Operating Agreement*

Men and women who apply to FedEx for positions as drivers must complete applications, submit to background checks and strength tests, and satisfy appearance standards. The only required skill is driving and no commercial driving experience is needed. Upon acceptance, a driver must execute a nonnegotiable "Pick-up and Delivery Contractor Operating Agreement" that obligates him to "provide daily pick-up and delivery service, and to conduct his . . . business so that it can be identified as being a part of the [FedEx] system." The "Operating Agreement" identifies the driver as an "independent contractor, and not as an employee . . . for any purpose," sets forth the parties' "mutual business objectives," notes that "the manner and means of reaching [these objectives] are within the discretion of the [driver]," and states that "no officer or employee of [FedEx] shall have the authority to impose any term or condition [including hours of work or travel routes] contrary to this understanding."

Under the terms of the Operating Agreement, the driver must provide his own truck meeting FedEx's specifications, mark the truck with the FedEx logo, pay all costs of operating and maintaining the truck (including repairs, cleaning, fuel, tires, taxes, licenses and insurance), and use the truck exclusively in the service of FedEx (or mask the logo if the truck is used for any other purpose). The driver must provide "fully competitive" service to a "primary service area" assigned by FedEx, and the Operating Agreement acknowledges the driver's "proprietary interest" in his primary service area's customer accounts—but gives FedEx the right to reconfigure primary service areas (and to reassign packages to another driver) if the volume of packages in the driver's primary service area exceeds the amount the driver could reasonably be expected to handle on any given day. In the event of reconfiguration, the driver has a right "to receive payment" from FedEx or the benefited driver.

---

[2] Our statement of facts is based on the evidence (and inferences supporting the judgment) presented during a nine-week trial. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 937 [59 Cal.Rptr.3d 37].)

The Operating Agreement obligates the driver to try to "retain and increase" business within his primary service area; to "cooperate" with FedEx's employees, customers, and other drivers for the common goal of efficient pickup and delivery; to load, handle, and transport packages using methods designed to avoid theft, loss and damage; and to foster FedEx's "professional image" and "good reputation." The driver agrees to drive safely; to prepare driver logs, inspection reports, fuel receipts, and shipping documents; and (on a daily basis) to return these items and any collected charges and undeliverable packages to FedEx. He agrees to wear a FedEx-approved uniform and to maintain his appearance "consistent with reasonable standards of good order," his uniform "in good condition," and his truck in a "clean and presentable fashion."

For its part, FedEx reserves the right to have its management employees travel with the driver four times each year to verify that the driver is meeting FedEx's standards, and agrees to train or "familiarize [the driver] with [its] quality service procedures." FedEx pays or "settles" with a driver weekly based on a stated calculation, and offers the driver a "business support package" to help him obtain and maintain a truck, a scanner, clean uniforms, and other similar items, the cost of which is paid by the driver by deductions from his weekly "settlements."[3]

The driver may elect the initial term of his Operating Agreement (from one to five years), with automatic yearly renewals unless, 30 days before expiration of the term, one party gives the other written notice of termination. The Operating Agreement may be terminated at any time by mutual consent, by FedEx for "intentional misconduct or reckless or willfully negligent operation" of equipment, by either party for breach of the Operating Agreement's obligations, by either party if FedEx stops doing business or reduces its operations at the driver's terminal, and by a driver on 30 days' written notice. The driver has the right to challenge his termination by an arbitration at which, if he prevails, he may be awarded reinstatement or damages or both. A driver in good standing has the right to assign his rights under the Operating Agreement to a replacement contractor acceptable to FedEx. The Operating Agreement recites that it and its attachments constitute the "entire agreement and understanding between the parties," and that it can be modified only by a writing signed by both parties.

---

[3] The scanner, which is leased from FedEx, is the device used by the driver to obtain signatures when packages are delivered. Every driver's truck has a computer, and the driver must insert the scanner into the computer after each delivery so that customers have immediate access to delivery information via the FedEx Web site.

## 2. *Implementation of the Operating Agreement*

Although FedEx claimed at trial that the Operating Agreement (and only the Operating Agreement) determined the drivers' status as independent contractors, both sides presented anecdotal and other evidence through the testimony of numerous drivers, FedEx managers, and experts.

Notwithstanding the merger clause in the Operating Agreement, the drivers' relationship to FedEx is defined by a number of other sources, including the FedEx "Ground Manual" and "Operations Management Handbook," which set forth "policies and procedures" in great detail to ensure the uniform operation of FedEx terminals throughout California, as well as by recruiting materials, welcome packets, memoranda, training videos, bulletin board posters, roundtable presentations, and similar means of communication.

A new driver leases a scanner and purchases or leases a truck (usually obtained from FedEx preferred vendors) that meets FedEx's size, model and condition specifications, paints the truck "FedEx White," and applies the FedEx logo to the truck. To pay for these items, drivers may obtain loans through FedEx's business support programs (with repayment through pay deductions). FedEx offers its drivers a deferred compensation or retirement plan (the record is ambiguous on this point) and other "employee benefits" (including direct deposit, a seniority-based "time-off program" for unpaid leave, and a scholarship program for the drivers' children). As is true of all FedEx employees, drivers are paid weekly at rates set by FedEx without negotiation (the drivers' rate is based on a daily rate, a piece rate for packages handled, and bonuses for length and quality of service).[4] Customers are billed by FedEx, not the drivers.

Regional managers supervise terminal managers and have weekly discussions about goals and procedures. Terminal managers, in turn, supervise and train drivers. Drivers work full time and exclusively for FedEx, and must work every day FedEx provides service unless they have preapproved replacements. FedEx sets the drivers' work hours (9.5 to 11 hours a day), and the average driver has worked for FedEx for eight years, with an annual income of $35,000 to $50,000 after expenses. The drivers and their trucks are subject to inspection every day (the trucks must be clean, the drivers in uniform and well groomed), and if either fails inspection, the driver may be barred from service.

---

[4] Drivers are paid according to a complex formula that includes $40 per day for working in uniform and providing a van, $5 per day for participating in the flex program, a piece-rate component based on the number of stops made and packages handled, and a daily "temporary core zone density" payment, plus a quarterly performance bonus based on years of service and a monthly bonus based on both the individual driver's performance and the performance of his terminal.

Trucks must be parked in assigned spots and loaded by FedEx employees with the packages assigned to the driver by management (the drivers may not refuse an assignment).[5] FedEx adjusts the number of assigned packages (thereby controlling the driver's hours and pay) by "flexing" from an adjacent route to balance the workload between drivers and in furtherance of its goal—deliver "every package, every day." Almost all drivers participate in the flex program. When necessary (as determined by FedEx), FedEx reconfigures primary service areas without payment by FedEx to the driver for lost customers.

Drivers may not leave the terminal at the beginning of the workday until sorting is completed, and terminal managers may contact drivers during the day about additional assignments. Drivers may "sequence" the order of deliveries and pickups but must meet all pickup and delivery times or "windows" arranged by FedEx's sales representatives and certain customers. These windows affect a driver's ability to sequence his own route. Drivers must comply with FedEx's rules for obtaining signatures on scanners, releasing packages without signatures, special handling of overnight and C.O.D. packages, and tracing undelivered or improperly delivered packages. Drivers must place their scanners in their computers after each delivery (fn. 3, *ante*), and at the end of each day must return to their assigned terminal parking spaces, deliver all paperwork and cash from C.O.D. payments, download their scanners, and provide details about any unsuccessful deliveries.

When on any given day a driver makes no attempt to deliver a package, misses a pickup time or window, or is the subject of a complaint, the matter must be discussed with the terminal manager who, in addition, meets with each driver twice each year to communicate and document shortcomings. Several times each year, terminal managers evaluate each driver's performance by means of a "customer service ride" and there are covert checks and security audits conducted in the field. Each driver receives an annual progress review. Terminal managers decide which "failures to service" or alleged breaches of the Operating Agreement to document, and they have discretion (subject to the regional managers' and upper management's approval) to recommend termination or nonrenewal.

---

[5] Under federal law, the drivers' trucks cannot be used for personal use during the hours they are used to deliver packages for FedEx. (See 49 C.F.R. § 376.12(c) (2007).) Because the drivers must park their trucks in assigned spaces at their terminals, and because the logos on most of the trucks are difficult if not impossible to conceal, FedEx's assertion that the drivers may use their trucks for other purposes during off-hours is more imagined than real. As a practical matter, most drivers rarely use their trucks for personal matters.

In practice, therefore, the work performed by the drivers is wholly integrated into FedEx's operation. The drivers look like FedEx employees, act like FedEx employees, are paid like FedEx employees, and receive many employee benefits.

## B. *The Phase I Statement of Decision*

The trial court found, and set forth in its statement of decision, that the drivers were FedEx employees, not independent contractors, and that they had not been indemnified for any of the expenses at issue. The court described the Operating Agreement as "a brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model"—because FedEx "not only has the right to control, but has close to absolute actual control over [the drivers] based upon interpretation and obfuscation."[6] The court found that FedEx's management witnesses "differed dramatically in their testimony as to the available remedies" for a driver challenging termination, with the head of contractor relations "admitting that he did not volunteer to [the drivers] any information about [their] rights to arbitrate or sue." In the trial court's view, FedEx's conduct established that the drivers could be terminated "at will."

The court found, in addition, that the drivers are "totally integrated into the [FedEx] operation," that they perform work essential to FedEx's core business, that they are required to work exclusively and full time for FedEx, that their customers are those assigned to them by FedEx, that no specialized skills are required, that they must wear uniforms and conform absolutely to FedEx's standards and that, in the end, each driver has a "job" with "little or no entrepreneurial opportunities." Although the drivers provide their own trucks and equipment, FedEx is involved in the purchasing process, providing funds and recommending vendors.

The essence of the trial court's statement of decision is that if it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck.

---

[6] The court found the drivers' right to control their own routes and schedules was illusive because they were "constrained by customer pick up and delivery windows contracted by the [FedEx] sales force" and by FedEx's paperwork requirements that required the drivers' presence at the terminal.

## DISCUSSION

### FedEx's Appeal

### I.

The trial court found that, for purposes of determining the drivers' right to reimbursement for their expenses, the drivers are employees within the meaning of Labor Code section 2802.[7] FedEx contends the trial court is wrong. We disagree.

### A.

Subdivision (a) of section 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ."

Because the Labor Code does not expressly define "employee" for purposes of section 2802, the common law test of employment applies. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1087 [32 Cal.Rptr.3d 483, 116 P.3d 1162].) The essence of the test is the "control of details"—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work—but there are a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350–351 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*); *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949 [88 Cal.Rptr. 175, 471 P.2d 975]; *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43–44 [168 P.2d 686]; *Air Couriers Internat. v. Employment Development Dept., supra*, 150 Cal.App.4th at p. 933 (*Air Couriers*); *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064–1065 [48 Cal.Rptr.3d 563].)[8] The parties' label is not dispositive

---

[7] Undesignated section references are to the Labor Code.

[8] *Air Couriers* and *JKH Enterprises* both involve package delivery drivers, albeit in different postures. In *Air Couriers*, a package delivery company sued the Employment Development

and will be ignored if their actual conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 877–878 [269 Cal.Rptr. 647].)

The determination (employee or independent contractor) is one of fact and thus must be affirmed if supported by substantial evidence. (*Borello, supra,* 48 Cal.3d at p. 349; *Air Couriers, supra,* 150 Cal.App.4th at p. 937; *Santa Cruz Transportation, Inc. v. Unemployment Ins. Appeals Bd.* (1991) 235 Cal.App.3d 1363, 1367, 1373 [1 Cal.Rptr.2d 64]; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at p. 877.) Because the trial court expressly relied on *Borello,* and because FedEx does not dispute the applicability of the *Borello* test, there is no question of law with regard to this issue, only one of substantial evidence. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 932–933, 937.)

## B.

FedEx contends the trial court misapplied the test (by an erroneous analysis of the "right to control" factor and otherwise) and made "insupportable inferences of fact" in determining that the drivers are employees. We disagree.

First, FedEx's assumptions are wrong. Although it is true that the Operating Agreement says "the manner and means" to satisfy the objectives of the contract "are within the discretion of the [drivers]," and that FedEx does not have the "authority to impose any term or condition" to the contrary, the evidence shows unequivocally that FedEx's conduct spoke louder than its words. As noted above, the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at pp. 877–878.) The same is true with regard to FedEx's claim that it cannot terminate the drivers at will. Although the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all—and substantial evidence established that FedEx discharges drivers at will. (*Toyota,* at p. 875.)

Second and most significantly, the trial court's findings are supported by substantial evidence. FedEx's control over every exquisite detail of the

Department for a refund of employment taxes, claiming its drivers were independent contractors; the trial court found the drivers were employees and the Third District affirmed. (*Air Couriers, supra,* 150 Cal.App.4th 923.) In *JKH Enterprises,* the Department of Industrial Relations found in administrative proceedings that a courier service's drivers were employees for whom workers' compensation insurance had to be provided; the courier service challenged the order by a petition for a writ of mandate, claiming the drivers were independent contractors. The trial court found the drivers were employees and the Sixth District affirmed. (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th 1046.)

drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors.[9] The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items—trucks and scanners—are obtained from FedEx-approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee.

Drivers—who need no experience to get the job in the first place and whose only required skill is the ability to drive—must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed.[10] The drivers are not engaged in a separate profession or business, and they are paid weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules. Most drivers have worked for FedEx for a long time (an average of eight years), and drivers employed by FedEx's competitors (UPS, DHL, and FedEx's sister corporation, FedEx Express) are classified as employees.

■ Based on these facts, we reject FedEx's contention that this is a "true entrepreneurial opportunity depending on how well the [drivers] perform" and conclude that substantial evidence supports the trial court's finding that the drivers are employees, not independent contractors, for purposes of section 2802. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 937–939; *JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th at

---

[9] The drivers were told they could not wear white shoes or socks; the men were told they could not wear earrings or ponytails, and sometimes that they needed to shave or get a haircut. We summarily reject FedEx's suggestion that constraints such as these are necessary to ensure the drivers' compliance with government regulations. (See *Southwest Research Institute v. Unemployment Ins. Appeals Bd.* (2000) 81 Cal.App.4th 705, 709 [96 Cal.Rptr.2d 769].)

[10] FedEx's reliance on *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188 [38 Cal.Rptr.2d 98], is misplaced. Although that case observes that "truck driving—while perhaps not a skilled craft—requires abilities beyond those possessed by a general laborer" (*id.* at pp. 202–203), the finding of independent contractor status in that case is based primarily on the facts that the truckdrivers worked for more than one broker at a time and were compensated on a job-by-job basis, "with no obligation on the part of the [drivers] to accept any assignment and no retribution . . . for refusing assignments." (*Id.* at p. 203.)

pp. 1064–1065; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at pp. 876–878.)[11]

## II.

FedEx contends the drivers' claims were unsuitable for class treatment, and that a classwide judgment is inappropriate on the evidence presented. More specifically, FedEx complains that the class certification order was flawed from the outset because it was based on the incorrect assumption that proof would focus on the terms of the Operating Agreement, when in fact the drivers offered "anecdotes about various alleged individual violations." In short, the claim is that individual facts predominated over the common issues. We disagree.[12]

## A.

The decision whether to certify a class is one within the trial court's discretion and will be set aside only upon a showing of abused discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 [17 Cal.Rptr.3d 906, 96 P.3d 194]; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435–436 [97 Cal.Rptr.2d 179, 2 P.3d 27].) On this record, FedEx cannot make the required showing because it is clear that common issues—whether

---

[11] The federal cases relied on by FedEx are factually inapposite. The truckers in *Berger Transfer v. Central States* (8th Cir. 1996) 85 F.3d 1374 were paid by the trip, could refuse assignments, and did not have to wear uniforms or paint their trucks with any special marks. The drivers in *C.C. Eastern, Inc. v. N.L.R.B.* (D.C. Cir. 1995) 60 F.3d 855 were paid by the job, did not have to wear uniforms, and could choose any kind of truck. The drivers in *Merchants Home Delivery Serv., Inc. v. N. L. R. B.* (9th Cir. 1978) 580 F.2d 966 were paid by the job, chose their own work hours, could refuse assignments, could sometimes work for other businesses, and operated as partnerships or corporations, not individuals. The drivers in *North American Van Lines, Inc. v. N.L.R.B.* (D.C. Cir. 1989) 869 F.2d 596 selected the frequency of their jobs, the type of loads, and the routes taken, and they did not have to wear uniforms. The drivers in *United States v. Silk* (1947) 331 U.S. 704 [91 L.Ed. 1757, 67 S.Ct. 1463] hired their own helpers and hauled for more than one business. Meanwhile, the drivers in our case are not paid by the job but by a formula established by FedEx and must work only for FedEx, must wear uniforms, must conform their personal appearance to FedEx's rules and regulations, must work on the days required by FedEx, and must use FedEx's method of delivery.

[12] We reject FedEx's assertion that the certification order assumed the trial would be limited to the terms of the Operating Agreement. There is nothing in the order itself or FedEx's brief to support this assumption. In fact, the reporters' transcripts of the hearings leading up to and following the certification order include several discussions about the scope of the evidence at trial—and it is clear that everyone understood the drivers were not "going to stand or fall on the operating agreement" but were "going to put in individual proof of the way things operate, and then we get to the issue of the way they operate at the time at each terminal, or span of time."

the drivers were employees and, if so, which expenses would be reimbursable—predominated. The anecdotal evidence was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the class as a whole, not just to the drivers who happened to be the subject of a particular anecdote. FedEx's failure to raise this point below suggests it understood that it would fail (it did not at any time during the nine-week trial move for decertification on the basis of the anecdotal evidence). (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1166–1167 [112 Cal.Rptr.2d 540]; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685–1686 [12 Cal.Rptr.2d 279].)

## B.

In a related argument, FedEx contends the class "never proved to be ascertainable or manageable in any reasonable sense: 209 distinct 'mini cases' . . . were required to ascertain who was actually within the class and . . . entitle[d] to reimbursement." We disagree.

A class action requires an ascertainable class with a well-defined community of interest among its members. Community of interest, in turn, requires that common questions of law or fact predominate, and that class representatives (who must be able to adequately represent the class) have claims typical of the class. The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description. (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828 [97 Cal.Rptr.2d 226].)

After much effort and briefing, the class was limited to SWA drivers who drive (or had driven) full time and who do not (or did not) subcontract their service areas out to others for reasons other than vacation, sick leave, or other commonly excused employment absences. The trial court found that the members of this class could reasonably be identified from FedEx's records and through discovery and, for the most part, they were. Discovery limited the class to 209 putative members. FedEx's suggestion that the members of this class shifted "in and out, sometimes on a day-to-day basis," is unsupported by a reference to the record and meaningless in the context of the trial transcript. If FedEx's claim is that every member of the class had to be identified from the outset, FedEx is simply wrong. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706 [63 Cal.Rptr. 724, 433 P.2d 732].)

## III.

FedEx contends that, assuming the drivers are employees, FedEx already indemnified them for the expenses due under section 2802. As did the trial court, we disagree.[13]

Subdivision (a) of section 2802 obligates an employer to indemnify its employee "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." According to FedEx, the Division of Labor Standards Enforcement requires reimbursement only for "any reasonable amount" (Div. of Lab. Stds. Enforcement Interpretive Bulletin No. 84-7 (Jan. 8, 1985)), and the settlement formula in the Operating Agreement "effectively provided reasonable compensation" for the drivers' business expenses. FedEx is wrong.

The Operating Agreement obligates the drivers to provide their own trucks, scanners, and clean uniforms, and to "bear all costs and expenses incidental to operation" of the trucks, including maintenance, cleaning, depreciation, fuel, oil, tires, repairs, taxes, licenses, tolls, and insurance. The drivers, the terminal managers, and FedEx's upper management all testified that drivers are expected to bear their own costs. As for the "settlement," the Operating Agreement provides that it is "for services provided," not expenses incurred (for example, "contractor and van availability"). FedEx's suggestion that the settlement formula is keyed to specific expenses and, as such, includes reimbursement for those expenses, is not supported by any evidence.[14]

## IV.

FedEx contends the attorneys' fee award is "manifestly improper," that it cannot be justified under Code of Civil Procedure section 1021.5, and that it

---

[13] The trial court found that "[n]o evidence was presented to support [FedEx's] position [that the drivers had already been indemnified for the expenses they sought under section 2802] and no language in the [Operating Agreement] would bolster that theory. Rather all witnesses testified that the [drivers] were responsible for their own expenses."

[14] We summarily reject FedEx's claim of evidentiary error. It says it "sought to introduce evidence . . . establishing that the settlement was designed *overall* to provide de facto compensation for *all* expenses incurred by contractors," and it says it wanted to do this by "showing that the payments contractors made to their own hired drivers were far less than what contractors received through the settlement system for equivalent work." FedEx's record references do not support this point. Instead, the cited pages show that FedEx tried to ask witnesses about information in their tax returns, and that the trial court properly sustained objections to those questions based on the taxpayer privilege and because FedEx had other means to present the same information. (*Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 6 [123 Cal.Rptr. 283, 538 P.2d 739].) FedEx did not make any offer of proof remotely similar to the argument it offers on this appeal. (*People ex rel. Dept. of Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46 [129 Cal.Rptr.2d 60].)

must in any event be revisited in light of our reversal of the equitable orders in *Estrada II*.[15] We reject FedEx's substantive challenges but agree that the amount cannot stand.

Code of Civil Procedure section 1021.5 provides as relevant that "[u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[16]

Estrada's motion asked for $619,691 in costs and $6,789,325 for his attorneys' fees, a total of $7,409,016—plus a 2.0 multiplier as compensation for delay and contingency, a total of $14,818,032. The trial court reduced the fee by 18 percent (finding the amount "slightly bloated") but otherwise granted the motion (including the 2.0 multiplier) and gave Estrada a total of $12,373,875 for costs and fees, noting the risk inherent in a contingent fee, the "financial burden of private enforcement," and the years of "long, hard-fought" and "labor intensive" litigation involving "enforcement of an important right" that conferred a "significant benefit on a large class." FedEx contends the award is erroneous because Estrada was motivated primarily by his own financial interests, that any benefit to a larger class was incidental, that no significant benefit was conferred on the public or a larger class, and that the trial court's dual use of the same reasons to both calculate the fee and justify the multiplier created a windfall. We reject FedEx's claim that fees were not recoverable in this case but agree that the amount must be reduced and that the same facts cannot be used to trigger the application of Code of Civil Procedure section 1021.5 *and* justify a multiplier.

### A.

Estrada's personal motivation does not diminish the fact that he pursued this public interest class action not only for himself but on behalf of a class

---

[15] Subsequent references to section 1021.5 are to that section of the Code of Civil Procedure.

[16] In addition, subdivision (a) of section 2802 compels an employer to indemnify its employee for "all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Subdivision (c) of section 2802 defines "necessary expenditures or losses" to include "all reasonable costs, including but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." Our conclusion that a fee award is justified under Code of Civil Procedure section 1021.5 makes it unnecessary to consider whether the section 2802 fee provision, which was enacted after this lawsuit was filed, applies in this case.

comprised of FedEx's past and present drivers and ultimately obtained awards for 209 drivers. (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459]; *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231 [226 Cal.Rptr. 265]; *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1005 [223 Cal.Rptr. 914].) No more is required to satisfy the "significant benefit," "public interest," and "large class of persons" requirements of Code of Civil Procedure section 1021.5.

## B.

But Estrada did not get everything he sought. In *Estrada II,* we reversed all the equitable orders, finding that Estrada lacked standing to pursue his claims for prospective equitable relief (a) because his relationship with FedEx ended before this lawsuit was filed, and (b) because the class certification order was expressly limited to the reimbursement issue. (*Estrada II, supra,* B187951.) The equitable orders were a significant part of the litigation and the resulting judgment.

In Phase III of these proceedings, Estrada sought declaratory relief and a permanent injunction on behalf of "all California single work area pick-up and delivery drivers who at any time since May 11, 1996 worked or currently work or in the future are employed to work under FedEx's Operating Agreement." The trial court rejected FedEx's defenses, finding among other things that it was necessary to address the equitable claims in light of the "importance and recurring nature of the employment issues of the [drivers]." A permanent injunction issued, enjoining FedEx from (1) misclassifying drivers as independent contractors or participating in any agreement to misclassify them as independent contractors, and (2) violating or attempting to violate *any provision of the California Labor Code, Industrial Welfare Commission orders, or other state laws and regulations protecting the drivers as employees—both in the present and for as long as FedEx retained the employment model or substantially similar employment model used by FedEx at the time of trial.* We reversed all of the equitable orders, finding that Estrada lacked standing to seek prospective declaratory or injunctive relief and that the trial court thus lacked jurisdiction to grant such relief.

When we reversed the equitable orders in *Estrada II,* we disposed of all of the benefits Estrada had obtained in the third phase of trial. Although we agree that Estrada is still the prevailing party, the factual predicate for the trial court's award—that Estrada won on all points, including the far-reaching injunctions—is no longer valid. Estrada concedes as much, noting in his respondent's brief that, under the short-lived injunctions, "the benefits of the instant litigation [would have been] enjoyed by thousands of people who are

not members of the class, including future [drivers] and employees," and that the equitable orders were "[m]ore important" to the trial court than the damages award because "the injunctive and declaratory relief require[d] [FedEx] to treat all its current and future [drivers] as employees and thus provide[d] ongoing relief to a huge group of people."

The $12,373,875 award is excessive and cannot stand.

## C.

In recalculating an appropriate fee award on remand, the trial court must determine anew whether any multiplier is appropriate in this case. The fee award sans multiplier ($5,567,246) exceeded the amount of the award to the entire class of plaintiffs (about $3 million before interest was added, about $5 million with prejudgment interest). By the time the trial court revisits this issue, the total monetary award to plaintiffs will have increased for the reasons explained below with regard to the drivers' cross-appeal, and the attorneys will have spent more time on this case both on appeal and on the postappeal trial court proceedings. While the amount of the fee is ultimately a decision within the trial court's discretion (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735]), the fee must above all else be reasonable and a multiplier, if used, must be based on facts other than those used to trigger the application of Code of Civil Procedure section 1021.5. (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 626 [98 Cal.Rptr.2d 388]; and see *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322–323 [193 Cal.Rptr. 900, 667 P.2d 704] [the starting point of every fee award must be a calculation of the attorney services in terms of the time spent on the case, and the exercise of the court's discretion in awarding fees must bear some reasonable relationship to the lodestar figure of time spent and hourly compensation].)[17]

### *Estrada's Cross-appeal*

## V.

Estrada raises five issues on his cross-appeal, four challenging the trial court's rulings vis-à-vis the damages proved during the Phase II trial, the fifth revisiting the dismissal orders that were the subject of *Estrada I*. We address these issues seriatim.

---

[17] The trial court's statement that it was "not double counting" does not change the fact that the reasons justifying any award at all *and* an award based on high hourly rates (to lawyers who took the case on a contingency basis) were the same as those used to justify the multiplier—the benefit to the class, the risk taken, the lawyers' skill, the excellent results.

## A.

The August 2, 2001 class certification order recites that "[c]ommon questions of fact clearly predominate in this case. All members of the proposed class . . . incurred the below-listed similar expenses, delineated in the Operating Agreement and certified by the Court as susceptible to proof on a class basis, as a direct consequence of performing services for [FedEx] . . . ." Ten categories of "[e]xpenses the [Operating Agreement] requires" were listed: (1) purchasing or leasing a vehicle for the purpose of performing pickup and delivery services; (2) operating the vehicle, including fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration and tolls; (3) maintaining the vehicle in accordance with federal, state and local law; (4) marking the vehicle with logos, colors, numbers, marks and insignia; (5) licensing the vehicle; (6) paying into the contractor performance escrow account; (7) purchasing, renting and cleaning uniforms; (8) purchasing or otherwise securing communications equipment, including but not limited to scanners and other required equipment; (9) obtaining liability insurance; and (10) obtaining and keeping in force "workers' compensation insurance for themselves."

On September 8, 2004, the trial court limited reimbursement to items actually paid out by the drivers or deducted from their settlement checks, ruled that proof of the claimed expenses would be "limited to receipts and personal records of the [drivers] . . . as well as records in the hands of [FedEx]," and limited some of the categories of recoverable expenses.[18] Four of the court's rulings are challenged on the drivers' cross-appeal.

## 1.

The trial court refused to permit proof of expenses by expert analysis and lay testimony about FedEx's estimates of the drivers' expenses, limiting the drivers' proof to receipts and records. More specifically, the trial court ruled "that sampling or statistical analysis [would] not suffice, as the amounts of monies that must be the subject of the accounting [would] be too disparate because of the economic differences in the California geographic area. . . . [¶] The [drivers] have the burden of proving areas of compensability by means

---

[18] In the same order, the trial court found that expenses recoverable under section 2802 included those related to the operation of the vehicle (fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration, and tolls); to maintaining the vehicle in accordance with federal, state and local law; to marking the vehicle; to licensing the vehicle; to purchasing, renting, and cleaning uniforms; to renting scanners; and to obtaining liability insurance. On its own motion, the trial court appointed a referee (Code Civ. Proc., § 639) to take evidence, perform "an accounting as to the expenses and reimbursements claimed by the individual plaintiffs and class members," and to make recommendations to the court.

limited to receipts and personal records . . . and [FedEx's] records . . . . [¶] The [drivers] will present a package to the referee containing the above items as to each [driver]. Upon receipt of said package, [FedEx] can either stipulate as to the amounts sought or file documents or records controverting those amounts." We reject Estrada's challenge to this ruling.

According to the drivers, they should have been permitted to offer "expert analysis computing the [drivers'] damages based on an economic model [that] used actual receipts produced by [the drivers] from around the state, together with expense estimates published in [a FedEx] recruiting booklet entitled, 'Becoming [a FedEx] Pickup and Delivery Contractor' [because the booklet included] data in the form of weekly and annual expense estimates," and a spreadsheet showing "the estimated costs for ten specific expense items projected over a ten-year period." The problem with this argument is that it is premised on a finding that the amounts due to the drivers were not susceptible of exact proof (*Long Beach Drug Co. v. United Drug. Co.* (1939) 13 Cal.2d 158, 174 [89 P.2d 386] [uncertain consequential damages]; *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745 [203 P.2d 778] [future damages]; *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545 [161 Cal.Rptr. 811] [lost profit damages]; *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 562 [282 Cal.Rptr. 181] [damages for lost commissions])—an assumption directly contradicted by the record the drivers established in proving their damage claims. In short, estimates and educated guesses are allowed where damages cannot be proved. That was not this case.[19]

## 2.

Although the September 2004 order required proof by receipts and other personal records, Estrada's lawyer—claiming she had an agreement with FedEx's lawyer—prepared spreadsheets listing the drivers' out-of-pocket expenses (such as gasoline and maintenance costs that were not deducted from the drivers' checks) with Bates-stamp references to each supporting document, the idea being that FedEx's lawyers would review the spreadsheets, determine which items were disputed, and request production of receipts for only the disputed items. After the deadline for the submission of evidence passed, FedEx objected to the spreadsheets as incompetent, contending there was no agreement to relieve the drivers of the court-ordered requirement to present all supporting documentation. The referee sustained the objection but found the drivers' lawyers had honestly "believed" an

---

[19] Moreover, the notices sent to the putative class members told them quite plainly that they would "be asked to document any expenses for which [they] claim[ed] reimbursement." (See *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934 [179 Cal.Rptr. 287]; and see *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 749–753 [9 Cal.Rptr.3d 544].)

agreement had existed, and therefore found that the drivers should be allowed to present proper proof—and accepted 40,000 documents (all of which had been produced to FedEx during discovery) which, if allowed, would result in an award to the drivers of about $5.23 million for these expenses.

FedEx objected to the referee's order. The trial court agreed with the referee that there had been no agreement,[20] found the drivers had offered "incompetent evidence," and approved the referee's decision to allow the drivers to reopen—but only with regard to expenses provable by documents FedEx had produced during discovery, which necessarily excluded all of the drivers' out-of-pocket expenses provable only by the drivers' documents.

The trial court's reason for allowing the partial reopening—so that FedEx would not obtain a "windfall"—is entirely inconsistent with its order limiting the scope of the allowed reopening. Because the trial court's reasoning was correct (FedEx would indeed obtain a windfall if it was not required to reimburse the drivers for provable expenses that had been part of the case from the beginning, all of which were fully documented and produced to FedEx during discovery), the only possible conclusion is that the trial court's order is wrong and must be reversed. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066 [24 Cal.Rptr.2d 654].) However wrong Estrada's lawyer might have been in believing she had an agreement with opposing counsel to use the spreadsheets without the related proof packets, her error caused absolutely no prejudice to FedEx.[21] Accordingly, the trial court must revisit this issue and conduct such further proceedings as are necessary to determine the amounts to be awarded to the drivers for these expenses.

### 3.

The trial court, relying on a January 1985 interpretive bulletin (Bulletin 84-7) issued by the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE), found the drivers were not entitled to reimbursement for expenses related "to purchasing or leasing a vehicle for the purpose of performing pick up and delivery services" because "employers in the pick up and delivery industry in California can require as a condition of

---

[20] The trial court's credibility call is binding on this appeal (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339]; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]) and is supported by the record. In addition to the trial court's requirements (actual receipts and documentation), the referee ordered the parties to present both "calculation sheets and proof packets."

[21] If, as FedEx suggests, the trial court's ruling was in effect a sanction based on its belief that the use of the spreadsheets "was an unauthorized tactic to get around the court's order with which [Estrada's lawyer] disagreed," the result was nonetheless an abuse of discretion—because the sanction, if that is what it was, should have been directed at counsel, not her clients.

employment that their drivers, at their own expense, purchase or lease a truck to the employer's specifications." Estrada contends the trial court should instead have relied on a January 2, 1997 DLSE opinion letter (No. 1997.01.02) opining that employees may not be required to purchase a $50,000 customized truck as a condition of employment. (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815 [105 Cal.Rptr.2d 59] [we do not defer to DLSE bulletins and opinion letters but may nevertheless consider them for what they are worth].)[22] We agree with the trial court.

### (a)

Bulletin 84-7 was a response to a question about "whether employers . . . may require mechanics or other employees to provide and maintain their own tools, regardless of the wages paid the employees, if it is customary in the industry for mechanics or other employees to do so." In response, the Labor Commissioner opined that "if an employee is paid at least twice the minimum wage, such employee may, as a condition of employment, be required to provide and maintain his[] own hand tools and equipment customarily required by the trade or craft." In addition, the Labor Commissioner opined that "[i]f an employee is paid at least twice the minimum wage, he[] may be required, as a condition of employment, to furnish his[] own tools, regardless of the custom or practice in the industry to the contrary."

In that context, the Labor Commissioner was also asked "whether an automobile or truck used in the course of employment by an employee . . . is a 'tool' within the meaning of [section 2802]." The commissioner answered that "neither an automobile nor a truck is considered a tool within the meaning of [section 2802], and *an applicant for employment may be required, as a condition of employment, to furnish his[] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid.* [¶] Under . . . [s]ection 2802, an employer who requires an employee to furnish his[] own car or truck to be used in the course of employment would be obligated to reimburse the employee for the costs necessarily incurred by the employee in using the car or truck in the course of employment." (Italics added.)

### (b)

The January 2, 1997 opinion letter is a response to a question based on this situation: " 'An employer hires a sales employee and requires him to purchase a customized truck for about $50,000.00, bearing the employer's name,

---

[22] The DLSE's opinion letters may be found at <http://www.dir.ca.gov/dlse/DLSE Publications.htm> (as of Aug. 13, 2007).

as a condition of employment. The employer then directs the employee to the vendor who sells the trucks and to a leasing company that will finance the truck. Finally, the employer directs the employee to an insurance company that will insure the truck.' " (DLSE Opinion Letter No. 1997.01.02.) The question was whether section 450 prohibits the employer from requiring the employee to patronize specific and identifiable third persons.[23] As relevant, the chief counsel for DLSE replied: "California courts have determined that [section] 450 . . .' . . . promot[es] the right of a wage earner to all wages lawfully accrued to him.' [¶] Clearly, a condition of employment which requires the employee or applicant to make a $50,000.00 purchase of a vehicle which advertises the name of the employer and further requires that the vehicle be purchased from one vendor (or any number of vendors) chosen by the employer is violative of [section] 450. [¶] *While your* [question] *does not* [mention section 2802,] *I feel that it is imperative that you also consider* [that statute]. . . . [¶] . . . [¶] [Section 2802] *may not be waived. (See . . . § 2804[.])*[24] *Obviously, even if the practice you describe were not prohibited by the terms of* [section] *450, the employer would be liable to the employee for the costs incurred by the employee under* [section] *2802. [¶] Quite frankly, the scenario you paint is usually the type of arrangement made in franchise situations, but the requirement to purchase something of value may not be extended to employer-employee situations . . .* [and] *is, in my opinion, clearly prohibited by California law.*" (DLSE Opn. Letter No. 1997.01.02, italics added, fn. omitted.)

The essence of Estrada's argument is that, by implication, the 1997 opinion letter is a clarification of Bulletin 84-7, and it is the 1997 opinion letter, not the bulletin, that is factually similar to FedEx's position vis-à-vis its drivers. The problem with this argument is that it fails to consider the DLSE's other relevant opinion letters.

**(c)**

According to the 2002 Update of The DLSE Enforcement Policies and Interpretations Manual (Revised) (§ 29.2.3.2, p. 29-2, <http://www.dir.ca.gov/dlse/Manual-Instructions.htm> [as of Aug. 13, 2007]), Bulletin 84-7 is still valid and has *not* been superseded by the 1997 opinion letter.[25] More

---

[23] Section 450 provides: "No employer . . . may compel or coerce any employee, or applicant for employment, to patronize his . . . employer, or any other person, in the purchase of any thing of value."

[24] Section 2804 provides: "Any contract or agreement, express or implied, made by any employee to waive the benefits of [the article including section 2802] or any part thereof, is null and void . . . ."

[25] According to section 29.2.3.2 of the manual, orders issued by the Industrial Welfare Commission (IWC) "allow an employer to require that employees furnish 'hand tools and

particularly, IWC wage order No. 9-2001, effective July 1, 2004, provides that *in the transportation industry,* "[w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, *except that an employee whose wages are at least two . . . times the minimum wage . . . may be required to provide and maintain hand tools and equipment customarily required by the trade or craft."* (Id., ¶ 9, p. 7.)[26] This 2004 statement by the IWC is entirely consistent with the DLSE's Bulletin 84-7, which provides that, because "neither an automobile nor a truck is considered a tool within the meaning of [section 2802], . . . *an applicant for employment may be required, as a condition of employment, to furnish his[] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid."* (Italics added.)

Other DLSE opinion letters presume it is proper for an employer to require an employee to provide his own car or truck for use on the job. Thus, a February 25, 1991 opinion letter (No. 1991.02.25-1) opines that when an employee uses his own automobile for his work, the employer must pay for the employee's insurance premiums. An August 30, 1991 opinion letter (No. 1991.08.30) responds to an inquiry about employees in the trucking business who own their own trucks and states that the DLSE's "enforcement policy requires that the employer agree to reimburse the employee for all the costs incurred by the employee in the operation of the equipment." An August 14, 1994 opinion letter (No. 1994.08.14) states that the reimbursement rates for an employee's use of his own truck differs from the rate applicable to automobiles. An opinion letter dated November 5, 1998 (No. 1998.11.05) responds to a question about employees who regularly drive their personal vehicles for business purposes and discusses the employer's obligation to pay insurance premiums for coverage above the legal minimum.

█ Implicit in all of these opinion letters is the assumption that it is perfectly lawful for an employer to require its employees to provide their

---

equipment' if the hand tools and equipment are 'customarily required by the trade or craft.' The DLSE has concluded that in the phrase 'hand tools and equipment', the word 'hand' is an adjective which modifies both the word 'tools' and the word 'equipment'. As the Labor Commissioner opined in 1984, an automobile is not the type of equipment contemplated in the IWC Orders." (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [94 Cal.Rptr.2d 3, 995 P.2d 139] [the IWC is the state agency empowered to formulate regulations governing employment in California, and the DLSE is the state agency empowered to enforce California's labor laws, including the IWC's orders].)

[26] The same order (at ¶ 2(P), p. 3) defines "transportation industry" to mean "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles." (IWC Wage Order No. 9-2001.)

own vehicles as a condition of employment, provided only that the employees must be reimbursed for the expenses thereby incurred. (And see *Lane v. Industrial Acc. Com.* (1958) 164 Cal.App.2d 523 [331 P.2d 99].)

The only commentary we have found (none being cited by either party) supports our conclusion that an employer may require its employees to provide their own trucks: "An applicant or employee may be required, as a condition of employment, to furnish his . . . own vehicle to be used in the course of employment. [Section] 2802 requires an employer to indemnify its employees for all necessary expenses or losses incurred in the course of his . . . duties." (Advising California Employers and Employees (Cont.Ed.Bar (2005) § 5.89, p. 454.) In sum, aside from two tangential and conclusory sentences in one DLSE opinion letter, we have not found any authority for Estrada's proposition that an employer cannot require an employee to provide his own truck as a condition of employment. To the contrary, the DLSE's other opinion letters, Bulletin 84-7, and the IWC wage order all assume that an employer can in fact do just that. Accordingly, we conclude that FedEx need not reimburse the drivers for the cost of their trucks.

## 4.

The certification order and the September 8, 2004 order listed "workers compensation" insurance as a recoverable expense, notwithstanding that virtually all of the drivers carried "work accident" insurance (a form of insurance for self-employed workers). Although this technical error was discovered during discovery (in 2002), the drivers' lawyers failed to clarify the point at that time and the trial court later refused to allow reimbursement for work accident insurance.[27] We agree with Estrada's challenge to this ruling.

Although the drivers' lawyers should have sought clarification instead of assuming that everyone understood that the drivers would be reimbursed for their work accident insurance premiums, the failure to do so does not justify a windfall to FedEx—particularly since it caused the confusion by treating the drivers as independent contractors and was at all times fully aware of the ambiguity in the court's orders (the Operating Agreement itself obligates the drivers "to obtain and keep in force at all times . . . work accident and/or workers compensation insurance . . ."). (See *Rainer v. Community Memorial*

---

[27] In response to an interrogatory asking for the amount deducted for "workers compensation" insurance, FedEx responded that there were no deductions for this item because it viewed "each driver to be a self-employed person." In response to an order to provide a further response, FedEx explained that the "parties resolved the ambiguity in the use of the term 'worker's compensation insurance payments' as [that term] is used in the [i]nterrogatory to be a reference to work accident insurance premiums."

*Hosp.* (1971) 18 Cal.App.3d 240, 254 [95 Cal.Rptr. 901]; *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31 [69 Cal.Rptr. 568, 442 P.2d 648]; *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761 [135 Cal.Rptr.2d 433]; *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564–565 [176 Cal.Rptr. 704]; *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111, 1124 [85 Cal.Rptr.2d 647].) The drivers are entitled to reimbursement for their work accident insurance premiums.

## B.

Estrada contends the trial court erred in "using the class questionnaires as a litmus test to determine which of the 700 absent class members wished to participate rather than . . . determin[ing] which fit the class definition" (thus making it a prohibited "opt-in" class action) and then "dismissing all absent class members who did not fully participate in discovery." We disagree.

After the class certification order and after our decision in *Estrada I, Hypertouch, Inc. v. Superior Court* (2005) 128 Cal.App.4th 1527, 1543 [27 Cal.Rptr.3d 839], held that "an 'opt-in' procedure is not authorized by and conflicts with California class action rules." (Capitalization omitted.) But *Hypertouch* does not support Estrada's challenge to his certification order because, as *Hypertouch* notes, "the existence of an ascertainable class is a precondition of class certification . . . ." (*Id.* at p. 1549.) In our case, discovery was necessary to determine whether in fact there was an ascertainable class and, if so, whether it was manageable. (*Estrada I, supra,* 125 Cal.App.4th at p. 983.) More to the point, Estrada's current argument ignores the fact that class certification was granted on the accepted condition that discovery would define the class. When prospective class members failed to respond (or responded inadequately) to the court-approved discovery requests, the court could not determine whether they fit the class definition or had compensable damages. Under these circumstances, there was no error.

## DISPOSITION

The judgment is reversed (1) insofar as it awards $12,373,875 to plaintiffs for their attorneys' fees and costs and (2) insofar as it disallowed the expenses discussed in parts V.A.2 and V.A.4 of this opinion; in all other respects, the judgment is affirmed and the cause is remanded to the trial court with directions to conduct such further proceedings as are necessary to determine the amounts to which the drivers are entitled for out-of-pocket expenses (pt. V.A.2.) and the amounts due for their work accident insurance

premiums (pt. V.A.4.), and to thereafter determine the reasonable amount of fees and costs to be awarded (pt. IV.). Estrada is entitled to his costs of appeal.

Mallano, Acting P. J., and Jackson, J.,[*] concurred.

The petition of appellant FedEx Ground Package System, Inc., for review by the Supreme Court was denied November 28, 2007, S156595.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.